```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x    FOR PUBLICATION
In re:                                                  :
                                                        :
HAWKER BEECHCRAFT, INC., et al.,                        :    Chapter 11
                                                        :    Case No.: 12-11873 (SMB)
                         Debtors.                       :
-----------------------------------------------------------x
```

### MEMORANDUM DECISION DENYING DEBTORS' MOTION
### TO IMPLEMENT A KEY EMPLOYEE INCENTIVE PLAN

**A P P E A R A N C E S:**

KIRKLAND & ELLIS LLP
Attorneys for the Debtors and Debtors in Possession
601 Lexington Avenue
New York, NY 10022

    James H.M. Sprayregen, Esq.
    Paul M. Basta, Esq.
    Patrick J. Nash, Jr., Esq.
    Ross M. Kwasteniet, Esq.
        Of Counsel

TRACY HOPE DAVIS
United States Trustee
33 Whitehall Street, 21st Floor
New York, New York 10004

    Paul K. Schwartzberg, Esq.
        Of Counsel

LOWENSTEIN SANDLER PC
Attorneys for the International Association of
  Machinists and Aerospace Workers, AFL-CIO
65 Livingston Avenue
Roseland, NJ 07068

    Sharon L. Levine, Esq.
    Paul Kizel, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**UNITED STATES BANKRUPTCY JUDGE:**

The Debtors filed a motion seeking approval of their proposed key employee incentive plan (the "KEIP") and their non-insider key employee retention plan (the "KERP"). (*See Debtors' Motion for Entry of an Order Approving the Debtors' Key Employee Incentive Plan and Key Employee Retention Plan and Granting Related Relief*, dated on July 13, 2012 ("*Motion*") (ECF Doc. # 349).) Following an evidentiary hearing, the Court approved the KERP from the bench, and reserved decision on the KEIP. Although the KEIP includes elements of incentive compensation, when viewed as a whole, it sets the minimum bonus bar too low to qualify as anything other than a retention program for insiders. Accordingly, the Court concludes that the Debtors have failed to sustain their burden of proof and denies the KEIP part of the *Motion* without prejudice.

**BACKGROUND**

**A.    Introduction**

At all relevant times, the Debtors have been engaged in the business of manufacturing and servicing business jets, trainer/attack aircraft and propeller and piston aircraft under the Hawker and Beechcraft brands. (*See Declaration of Robert S. Miller (I) In Support of the Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2*, dated May 4, 2012, at ¶¶ 6, 13 ("*Miller First Day Declaration*") (ECF Doc. # 22).) Burdened with excessive secured and unsecured debt, they filed chapter 11 petitions in this Court on May 3, 2012 (the "Petition Date"). (*Motion* at ¶ 4.)

Prior to the Petition Date, the Debtors had entered into a Restructuring Support Agreement (the "RSA")[1] with the majority of their creditors (the "Consenting Creditors") which, in substance, would convert 100% of their prepetition debt into equity (the "Standalone

---

[1]    A copy of the RSA is annexed as Exhibit A to the *Miller First Day Declaration.*

2

Transaction"). The Debtors also agreed prior to the Petition Date but in contemplation of bankruptcy to (a) file a plan of reorganization and disclosure statement by June 30, 2012, (b) obtain an order approving the disclosure statement by August 31, 2012, (c) confirm the plan by November 15, 2012 and (d) consummate the plan by December 15, 2012. (*Miller First Day Declaration* at ¶ 60.) The Debtors met the first deadline, and scheduled the hearing to approve their disclosure statement for August 30, 2012. The latter hearing (and presumably, the August 31 deadline) has been adjourned, on consent, to September 27, 2012.

The RSA did not preclude the Debtors and their advisors from engaging in a marketing process to pursue a sale or other strategic transaction with a third party ("Third-Party Transaction"). (*See* RSA at § 11.) The Debtors proceeded on a dual track pursuing the plan contemplated by the Standalone Transaction (the "Standalone Plan") while contemporaneously seeking a Third-Party Transaction that would provide greater value to the estates. (*See* Transcript of the hearing held July 26, 2012 ("*7/26 Tr.*") at 31:3-32:10 (ECF Doc. #432).) On or about July 2, 2012, the Debtors received a Second Revised Proposal from Superior Aviation Beijing, Co., Ltd. ("Superior") to purchase substantially all of the Debtors' assets (excluding its defense business) on a cash free, debt-free basis for $1.79 billion in cash (the "Superior Proposal").[2] The Superior Proposal was subject to several conditions including a 45 day exclusive access period during which the Debtors would cease soliciting or negotiating with

---

[2] A copy of the Superior Proposal is attached as Exhibit C to the *Debtors' Motion for the Entry of an Order Authorizing the Debtors to Enter into an Exclusive Negotiations Agreement and a Refund Agreement*, dated July 10, 2012) ("*Superior Exclusivity Motion*") (ECF Doc. # 324).

3

other third parties, the parties would execute a definitive agreement, the Debtors would hold a bankruptcy auction and the parties would obtain the necessary regulatory approvals.[3]

On July 10, 2012, the Debtors filed the *Superior Exclusivity Motion* which sought Court authorization to grant the 45 day exclusivity sought by Superior. Following an evidentiary hearing, the Court granted the *Superior Exclusivity Motion* over the objection of the International Associations of Machinists and Aerospace Workers, AFL-CIO ("IAM"), the union that represented 45% of the Debtors' workforce as of the Petition Date. (*Miller First Day Declaration* at ¶¶ 6, 21.)

**B.    The *Motion***

The Debtors historically maintained incentive plans that paid certain key employees additional compensation through an annual cash incentive program based on certain cash and percentage profit targets and through equity-based awards. (*Declaration of Robert S. Miller in Support of the Debtors' Motion for Entry of an Order Approving the Debtors' Key Employee Incentive Plan and the Key Employee Retention Plan and Granting Related Relief*, dated July 13, 2012 ("*Miller KEIP Declaration*"),[4] at ¶ 11; *see 7/26 Tr.* at 25.) The Debtors did not pay any bonuses to senior management under the 2011 plan because it failed to meet its targets. (*7/26 Tr.* at 54.) There is also the structure for an incentive program in place for 2012, but the objectives have not been developed due to the instability in the business. (*Id.* at 26.)

As they contemplated bankruptcy, the Debtors opted to develop a senior management incentive program, and retained Towers Watson, executive compensation experts, to assist in its

---

[3]    Among other things, a sale to Superior, a Chinese entity that is partially owned by the City of Beijing, will require the approval of the Committee on Foreign Investment in the United States.

[4]    A copy of the *Miller KEIP Declaration* is annexed to the *Motion* as Exhibit B.

development. According to the testimony of Nick Bubnovich, a former director of Towers Watson who testified as an expert, the Debtors' senior management's base salary stood at 58% below the market median, (*id.* at 78), substantially below market. (*Id.* at 84.) Working in conjunction with the Official Committee of Unsecured Creditors (the "Committee") and the Consenting Creditors, the Debtors' developed the KEIP and filed the *Motion* seeking its approval.[5]

The KEIP applies to eight "insiders" within the meaning of 11 U.S.C. § 101(31), denominated as the senior leadership team, or SLT. They include the Debtors' Chairman, the Executive Vice President of Operations, the Vice President of Human Resources, the Vice President of Engineering, the Executive Vice President and General Counsel, the Senior Vice President of Global Customer Support, the Chief Financial Officer and the Executive Vice President of Customers. (*Motion* at ¶ 18.) The KEIP offers two mutually exclusive paths for awarding bonuses to the SLT depending on whether the Debtors consummate the Standalone Plan or a Third-Party Transaction. To be eligible to receive payment of any award, the SLT member must be employed on the effective date of the plan unless the SLT member has been terminated without cause or resigned for good reason prior to the date that payment is due. (*Id.* at ¶¶ 27, 30.)

1.   **The Standalone Plan**

Each member of the SLT can earn up to 200% of his annual base salary, or the aggregate amount of $5,328,000, in the event the Debtors' consummate the Standalone Plan (the "Standalone Transaction Award"). The award is comprised of two independent components with 50% based on the timing of the consummation (the "Consummation Award") and 50%

---

[5]   The *Motion* also sought approval of the KERP. As noted, the latter was approved from the bench.

based on the achievement of financial targets (the "Financial Performance Award"). The Consummation Award provides for a sliding scale of recovery under which the SLT members can earn a bonus if the Debtors consummate the Standalone Plan on or before December 15, 2012. The earlier the consummation, the greater the award. The following table, taken from the Motion, illustrates the target dates, and the percentage of base salary and total payouts under the Consummation Award:

| Level | Date of Plan Consummation | % of Base Salary | Total Payout |
| --- | --- | --- | --- |
|   | After 12/15/12 | 0% | $0 |
| 1 | After 12/8/12, but on or before 12/15/12 | 50% | $1,332,000 |
| 2 | After 12/1/12, but on or before 12/8/12 | 62.5% | $1,615,000 |
| 3 | After 11/24/12, but on or before 12/1/12 | 75% | $1,938,000 |
| 4 | After 11/17/12, but on or before 11/24/12 | 82.5% | $2,131,800 |
| 5 | **Stretch Goal** - On or before 11/17/12 | 100% | $2,664,000 |

(*Id.* at ¶ 21.) These dates can be extended without notice or Court approval at the discretion of the Debtors and with the agreement of the Consenting Creditors and the Committee. (*Id.*) In addition, the target consummation dates will automatically be extended by the number of days (but not to exceed 30 days) beyond August 31, 2012, in which the Debtors have not resolved the treatment of their three defined benefit pension plans. (*Id.*)

The second component of the Standalone Transaction Award is the Financial Performance Award. The computation of this award is set out in a complicated chart at paragraph 23 of the Motion; it is based on a sliding scale of targets relating to the Debtors' cumulative net cash flow starting on July 9, 2012, and ending as of the end of the week in which the plan is consummated. The lowest target level, which pays 50% of the base salary to each member of the SLT, corresponds to the projections under the Debtors' business plan. (*7/26 Tr.* at 66.)

6

### 2. Third-Party Transaction

The KEIP includes a separate set of incentives if the Debtors consummate a plan based on a Third-Party Transaction. Each member of the SLT would receive a sale bonus of 200% of his base salary upon Court approval of a Third-Party Transaction prior to December 15, 2012 that (a) results in a purchase price of at least $1.79 billion and (b) closes no later than January 15, 2013 (the "Third-Party Transaction Award"). (*Motion* at ¶ 29.) As with the Consummation Award, these dates can be extended with the consent of the Committee and the Consenting Creditors. (*Id.* at ¶ 29 n.10.) If the Court-approved Third-Party Transaction results in a purchase price of less than $1.79 billion, the Third-Party Transaction Award would decrease by 25% of each SLT member's base salary for each $100 million in purchase price below $1.79 billion. However, there would not be any downward adjustment if (a) the decrease in purchase price is the result of a purchase price adjustment triggered by the assumption of certain liabilities (which is not currently contemplated) and (b) the assumption of such liabilities is supported by the Committee. (*Id.*) In the event the Debtors determine to pursue the Third-Party Transaction, but through no fault of management, the Third-Party Transaction does not close, the Debtors will award the Standalone Transaction Awards, but the level of cumulative net cash flow that needs to be reached for 50% of the bonus will be adjusted to reflect the costs expected to be incurred while the Debtors pursue the Third-Party Transaction. (*Id.* at ¶ 31.)

### DISCUSSION

The Debtors concede that the members of the SLT are "insiders," and accordingly, the threshold question raised by the objections to the Motion is whether the KEIP is a true incentive plan, or instead, a disguised retention plan. Section 503(c)(1) of the Bankruptcy Code governs

retention plans applicable to insiders.[6] Congress enacted § 503(c) as part of the 2005 BAPCPA amendments to the Bankruptcy Code to "eradicate the notion that executives were entitled to bonuses simply for staying with the Company through the bankruptcy process," *In re Global Home Prods., LLC*, 369 B.R. 778, 784 (Bankr. D. Del. 2007) (internal quotation marks omitted); *accord In re Velo Holdings Inc.*, 472 B.R. 201, 209 (Bankr. S.D.N.Y. 2012), and to "limit the scope of 'key employee retention plans' and other programs providing incentives to management of the debtor as a means of inducing management to remain employed by the debtor." 4 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 503.17, at 503-105 (16th ed. 2012).

A debtor is, of course, free to propose a KERP for the benefit of insiders that satisfies the rigorous criteria in § 503(c)(1). Furthermore, § 503(c)(1) does not prevent a debtor from adopting a plan that rewards insiders for achieving financial or other targets, rather than for simply remaining in the employment of the debtor, even though the incentive plan has a retentive

---

[6] Section 503(c)(1) provides:

(c) Notwithstanding subsection (b), there shall neither be allowed, nor paid—

(1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that—

(A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

(B) the services provided by the person are essential to the survival of the business; and

(C) either--

(i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred; . . . .

8

effect. *See In re Dana Corp.*, 351 B.R. 96, 102 (Bankr. S.D.N.Y. 2006) ("*Dana I*"). The concern in the type of motion presented in this case is that the debtor has dressed up a KERP to look like a KEIP in the hope that it will pass muster under the less demanding "facts and circumstances" standard in 11 U.S.C. § 503(c)(3). *Velo Holdings*, 472 B.R. at 209 (reasoning that courts must be wary of attempts to characterize what is essentially an insider retention plan as an "incentive" plan "to bypass the requirements of section 503(c)(1)" and should "consider the circumstances under which particular proposals are made, along with the structure of the compensation packages, when determining whether the compensation programs are subject to section 503(c)(1)"); *see Dana I,* 351 B.R. at 102 n.3 ("If [a bonus proposal] walks like a duck (KERP), and quacks like a duck (KERP), it's a duck (KERP)."). The Court must examine a proposed KEIP mindful of the practice that Congress sought to eradicate and, at the risk of oversimplification, determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work. *See Velo Holdings,* 472 B.R. at 209 ("The effect of section 503(c) was to put in place 'a set of challenging standards' and 'high hurdles' for debtors to overcome before retention bonuses could be paid."); *In re Mesa Air Group, Inc.*, No. 10-10018 (MG), 2010 WL 3810899, at *2 (Bankr. S.D.N.Y. 2010) (same); *Global Home*, 369 B.R. at 784-85 (same). The proponent of the KEIP bears the burden of proving that the plan is not a retention plan governed by § 503(c)(1). *See Mesa Air Group*, No. 10-10018 (MG), 2010 WL 3810899, at * 3.

      Here, the Debtors have failed to sustain their burden of proof. At the outset, they did not identify the roles of each member of the SLT or why, individually or as part of a team, they will contribute services that are necessary to achieve the targets. Beyond that, although the KEIP

9

includes incentivizing targets, the lowest levels are well within reach.[7] The SLT will earn a bonus under either of two transactions one of which is bound to occur. The Debtors are on target to meet the confirmation and consummation deadlines under the RSA and KEIP pertaining to the Standalone Transaction, but in any event, the deadlines under each alternative can be extended with the consent of the parties.

Each alternative includes a financial target (cumulative net cash flow or sale price), but the Debtors do not have to hit any financial target to pay a bonus under the Standalone Transaction,[8] and the sale price target does not seem to be much of a challenge in light of the Superior Proposal and the fact that the Debtors must still pay a bonus even if a Third-Party Transaction is consummated at a substantially reduced price.[9] In essence, the KEIP pays a bonus for consummating a plan that is likely to occur, and closely resembles the KERP rejected in *Dana I*. *See Dana I*, 351 B.R. at 102 (refusing to approve incentive plan that paid a completion bonus even if the debtors' total enterprise value declined).

Furthermore, the SLT member does not earn a bonus if the member quits prior to consummation of the transaction (the effective date of a plan). Thus, if the SLT member does

---

[7] The Debtors are fond of basketball analogies and argue that the targets are not "lay-ups." That may be so, but they are more like free throws than half court flings at the buzzer.

[8] The SLT member can earn an additional 50% bonus if the Debtors achieve the cash flow targets that are identical to their business plan projections, and can be met if the Debtors don't encounter any "whoopsies." (*7/26 Tr.* at 60.) The Debtors' witnesses ticked off numerous uncertainties on the income and expense sides, (*id.* at 67-69), but uncertainty is inherent in every prediction, and I assume that they were taken into account when the predictions were made by the Debtors' sophisticated financial employees and professionals. Furthermore, the Debtors cited the cost of carving out the defense business as one uncertain cost, (*id.* at 43, 69), but this expense will only be incurred in connection with the Third-Party Transaction and should be entirely irrelevant to the Financial Performance Award. Moreover, the Debtors did not offer evidence whether or not they were on target to achieve their projections.

[9] The 200% bonus will be reduced by 25% for every $100 million below the $1.79 billion Superior offer at which a Third-Party Transaction is consummated. In addition, the bonus reduction will be prorated to the extent that the price falls between two $100 million increments. Thus, if the Debtors consummate a Third-Party Transaction for as low as $1 billion, the SLT members will still earn a bonus.

10

everything required of him and more, but the effective date is delayed because of an appeal, and the SLT member takes another job in the interim, he sacrifices his bonus. In other words, he has to stay for his pay.

Finally, the Debtors' Chief Executive Officer Robert S. Miller confirmed the retentive purpose of the Third-Party Transaction Award. He opined that in its absence, "the SLT could seek alternative employment opportunities and, as a result, immediately undermine the Debtors' restructuring efforts at a critical juncture of the Debtors' chapter 11 cases and in the Debtors' business cycle." (*Miller KEIP Declaration* at ¶ 30.)

The Debtors' authorities do not support a contrary conclusion. In *In re Borders Group*, 453 B.R. 459 (Bankr. S.D.N.Y. 2011), the debtors proposed a KEIP for the benefit of insiders that required them to confirm an ongoing (non-liquidating) business plan or consummate a sale of the business as a going concern under 11 U.S.C. § 363 *and* meet specific financial targets relating to annual rent reductions or other cost reductions as well as distributions to unsecured creditors. No bonuses would be paid in the event of a liquidation or going-out-of-business sales at the majority of the debtors' stores, the confirmation of a non-consensual plan, or the approval of a sale over the Committee's objection. *Id.* at 465-66. The Court approved a KEIP because the financial milestones and accomplishment of a qualifying transaction were both required, the debtors had to achieve rent reductions or other cost reductions, and the type of qualifying transaction was limited to one that continued the business in one form or another. *Id.* at 471-72. In this case, the SLT can earn a 50% bonus if the Debtors confirm and consummate the Standalone Plan by the dates agreed to under the RSA which are subject to extension, even if the Debtors' miss their financial targets. Furthermore, the sales price target under the Third-Party Transaction that must be met to earn some bonus is hardly challenging.

11

In *In re Dana Corp.*, 358 B.R. 567 (Bankr. S.D.N.Y. 2006) ("*Dana II*"), the Court approved a long term incentive plan that awarded bonuses if the company reached a specific EBITDAR, and the bonuses increased as EBITDAR increased. The plan represented substantial reductions from the long-term incentive plans that were available pre-petition. *Id.* at 574. The Court approved the incentive plan based upon evidence showing that the debtors' pro forma EBITDAR was $210 million, and achieving the financial target of $250 million was difficult and not a "lay-up." *Id.* at 583. Here, the minimum target level matches the business plan projections, the Debtors' Chief Executive Officer testified that they should hit at least the minimum target if they don't encounter any "whoopsies," and the Debtors failed to compare their pre-petition plans to the KEIP.

*Velo Holdings* is more apposite but still distinguishable. There, the debtors proposed an incentive plan that included net operating cash flow targets based on the DIP budget. The pool applied to three executives and consisted of $600,000. In addition, the executives had to provide additional transitional services. *Velo Holdings*, 472 B.R. at 205-06. Although the Court approved the use of financial targets that were the same as those set forth in the debtors' business plan, it also cited to the fact that the KEIP required the executives "to *do more* to meet the wide-scale goals outlined in the KEIP as they must address concerns and issues that are unique to the bankruptcy proceeding. The KEIP encourages the Executive Employees to increase their pre-bankruptcy job responsibilities to achieve the bonus requirements and financial targets." *Id.* at 210. (Emphasis in original.)

In the same vein, the proposed KEIP in this case keys the minimum 50% Financial Performance Award under the Standalone Plan to the business projections. In addition, the Debtors offered general testimony that the SLT members will be required to provide the services

12

necessary to move down dual plan paths. (*7/26 Tr.* at 26, 29-30.) To that extent, *Velo Holdings* is analogous. However, the SLT members can earn a 50% Consummation Award through the Standalone Plan under an indefinite deadline without meeting any financial targets. In addition, they can earn a 200% bonus under the Third-Party Transaction by consummating the transaction under a flexible deadline at a price that Superior has already offered, or a lesser bonus at a substantially lower price.[10]

Nothing in this opinion is meant to denigrate the efforts of the SLT or minimize their contributions to the success of the case. Nevertheless, the BAPCPA changes impose a high standard that requires challenging goals that insiders must meet in order to earn a bonus under an incentive plan that is not subject to § 503(c)(1). The targets at the higher end of the KEIP meet this requirement but the goals at the lower end do not. Because the SLT members will likely earn some bonus under the KEIP merely by remaining with the Debtors and regardless of the road the Debtors take, approval of the KEIP must be denied. In light of this conclusion, I do not decide whether the KEIP is an appropriate exercise of business judgment or satisfies the "facts

---

[10] The Debtors also cite to snippets of hearing transcripts or orders entered in other cases. (*See Debtors' Proposed Findings of Fact and Conclusions of Law*, dated Aug. 6, 2012 (ECF Doc. # 457).) I do not consider these to be persuasive.

and circumstances" test imposed under § 503(c)(3).

The foregoing constitutes the Court's findings of fact and conclusions of law. Submit order.

Dated: New York, New York
       August 24, 2012

                                          /s/ *Stuart M. Bernstein*
                                          STUART M. BERNSTEIN
                                          United States Bankruptcy Judge