```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X   FOR PUBLICATION
In re:                                                          :
                                                                :
HAWKER BEECHCRAFT, INC., et al.,                                :   Chapter 11
                                                                :   Case No.: 12-11873 (SMB)
                       Debtors.                                 :   Jointly administered
----------------------------------------------------------------X
```

## MEMORANDUM DECISION AND ORDER
## COMPELLING DEBTORS TO ASSUME OR
## REJECT AGREEMENT WITHIN A SPECIFIED TIME

**A P P E A R A N C E S:**

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

      James H.M. Sprayregen, Esq.
      Paul M. Basta, Esq.
      Patrick J. Nash, Jr., Esq.
      Ross M. Kwasteniet, Esq.
          Of Counsel

*Attorneys for the Debtors and Debtors in Possession*

CARLTON FIELDS, P.A.
525 Okeechobee Blvd., Suite 1200
West Palm Beach, FL  33401

      Franck D. Chantayan, Esq.
      Bruce J. Berman, Esq.
          Of Counsel

    — and —

JONES DAY
222 East 41st Street
New York, NY 10017

      Paul D. Leake, Esq.
      Kelsey I. Nix, Esq.
      Jane Rue Wittstein, Esq.
      Lance E. Miller, Esq.
          Of Counsel

*Attorneys for Pilatus Aircraft Ltd.*

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036

    Daniel H. Golden, Esq.
    David H. Botter, Esq.
    Alexis Freeman, Esq.
      Of Counsel

*Attorneys for Official Committee of Unsecured Creditors*

**STUART M. BERNSTEIN**
**UNITED STATES BANKRUPTCY JUDGE:**

      Hawker Beechcraft Corporation ("Hawker"), one of the Debtors in the above-captioned jointly administered bankruptcy cases, and Pilatus Aircraft Ltd. ("Pilatus") are parties to a *Second Amended and Restated Definitive Agreement*, dated Oct. 18, 2004 ("*Agreement*"), which relates to Hawker's use of Pilatus's intellectual property ("IP") in the manufacture, sale and support of certain aircraft.[1] Pilatus has moved to compel the Debtors to assume or reject the *Agreement* within a specified time. For the reasons that follow, the motion is granted to the extent indicated below.

## BACKGROUND

      The background facts are not in dispute. In early 1990, Hawker's predecessor, Raytheon Aircraft Company, then known as Beech Aircraft Corporation ("Beech"), sought to compete for a United States Government contract to supply aircraft to the United States Air Force and Navy for the Joint Primary Aircraft Training System ("JPATS"). Pilatus, a Swiss company, manufactured the Pilatus PC-9 Advanced Turboprop Trainer aircraft ("PC-9"). At the time of

---

[1] A copy of the *Agreement* is annexed as Exhibit A to the *Motion for Order Under 11 U.S.C. § 365(d) Directing Debtors to Determine Within Four Weeks of an Order Approving the Motion Whether to Assume or Reject Executory Contract with Pilatus Aircraft, Ltd and for Related Relief*, dated Aug. 13, 2012 ("*Motion*") (ECF Doc. # 471).

2

the JPATS bid solicitation, the PC-9 trainer was already used as a trainer aircraft in military branches of governments around the world.

Beech and Pilatus eventually entered into a "Definitive Agreement" in contemplation of the parties competing jointly for the JPATS contract. They planned to offer a missionized version of the PC-9 modified by Beech into the Beech-Pilatus Trainer ("BPT") to meet the training requirements of the United States Air Force and Navy. Pursuant to the Definitive Agreement, Pilatus provided Beech with actual PC-9 aircrafts, plans, drawings and information, and its own design engineers to work with Beech and enable Beech to manufacture what ultimately became known as the Texan T-6 (the "T-6").

In return, Beech agreed to pay royalties to Pilatus in connection with aircraft sales. This included the obligation to pay royalties on so-called "derivative aircraft" sold to the United States for the JPATS program and internationally to other customers. The inclusion of derivative aircraft reflected the expectation that the Definitive Agreement would last for an indefinite period and advances in technology would lead to modifications.

Disputes eventually arose regarding the royalties payable in connection with the international T-6 sales. The disputes were subject to arbitration, and in 1999, the parties reached a settlement. On October 26, 2000, they entered into an "Amended and Restated Definitive Agreement," which clarified Pilatus's right to compete without restriction in the international market for trainer aircraft against the T-6 without affecting its royalty entitlement.

On October 18, 2004, Pilatus and Beech entered into the *Agreement* to clarify certain terms of their prior agreements and to incorporate the modifications into a new agreement that

superseded the Amended and Restated Definitive Agreement. The *Agreement* included the following provisions:

i. Pilatus continued to grant Beech a "fully paid-up, non-exclusive, non-transferable right and license" to use the data and inventions of the PC-9 belonging to Pilatus to the extent necessary to manufacture, sell and support the BPT or Derivative Aircraft. (Art. 6.1.)

ii. "Derivative Aircraft" meant "an aircraft on the same Type Certificate[2] as the BPT." (Art. 1.9.)

iii. Pursuant to the grant of a right and license, Beech was granted the exclusive right to manufacture and market the BPT and Derivative Aircraft worldwide. (Art. 4.1(A).)

iv. Beech agreed to pay Pilatus a royalty for each BPT or Derivative Aircraft that it manufactured and sold to anyone anywhere in the world, (Art. 4.3 (A), (B)), within fifteen days following the end of the calendar month for each BPT or Derivative Aircraft delivered within the calendar month to a customer. (Art. 4.5.)

v. The parties acknowledged that they had previously exchanged certain technical and proprietary data, and agreed not to disclose the other party's proprietary data except on a need-to-know basis and to take reasonable precautions to prevent the disclosure of the data to others. (Art. 5.1, 5.4.)

vi. The *Agreement* was perpetual, and could be terminated only by subsequent written agreement of the parties. (Art. 4.10.)

vii. Nevertheless, the right and license would "immediately terminate" if Beech stopped manufacturing, selling and supporting the BPT or Derivative Aircraft. In that event, Beech was required to provide immediate written notification (with copies to Pilatus) to all third parties that had been granted such rights and

---

[2] An aircraft's "type certificate" facilitates the certification of individual aircraft. Once issued by the Federal Aviation Administration, the "type certificate" allows a manufacturer to obtain "airworthiness certification" for individual aircraft that are made in accordance with the designs described in the type certificate. Jeff C. Dodd, *Rights in Information: Conversion and Misappropriation Causes of Action in Intellectual Property Cases*, 32 HOUS. L. REV. 459, 480 n.116 (1995); *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 899 (9th Cir. 1992) ("Because the certification procedure is complex and expensive, the FAA certifies airplane types rather than individual planes. Aircraft manufacturers are required to test and analyze new airplane designs themselves; the FAA then determines the airworthiness of the design based on the manufacturer-generated engineering data and test results. Once a manufacturer has demonstrated the safety of its design, the FAA issues it a Type Certificate. The manufacturer can then obtain a production certificate by proving to the FAA that each duplicate airplane will comply with the Type Certificate.").

      licenses that the rights and licenses had been terminated, and to instruct them to cease and desist using such rights and licenses immediately.  (Art.  6.1.)

During the two decade relationship with Pilatus, Hawker and its predecessors manufactured, sold and supported the T-6 and Derivative Aircraft (collectively, the "T-6 Trainer") throughout the world.  The manufacture and sale of the T-6 Trainer is one of the most important sources of revenue for the Debtors.  In calendar year 2011, the Trainer/Attack segment of the Debtors' business, which includes the T-6 Texan II, accounted for 26% of the Debtors' consolidated sales.  (*Amended Disclosure Statement for Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated Nov. 30, 2012 ("*Amended Disclosure Statement*"), at 13 (ECF Doc. # 873).)  Until shortly before the filing of the petition in these cases, Hawker accounted for and paid all royalties to Pilatus due under the *Agreement*.

Although Hawker continued to manufacture and sell the T-6 Trainer post-petition, it stopped making royalty payments to Pilatus.  As a result, Pilatus filed two applications.  First, it moved to compel the immediate payment of the post-petition royalties as an administrative expense.  (*See Motion for Order Allowing Administrative Expense Claim, Compelling Payment, and for an Accounting*, dated July 10, 2012 ("*Administrative Claim Motion*") (ECF Doc. # 326).)  The Debtors opposed the motion contending, among other things, that "the Debtors have grounds to believe that they potentially are not using any of [Pilatus's] intellectual property in their present aircraft production process."  (*Debtors' Objection to Pilatus Aircraft Ltd.'s Motion for Order Allowing Administrative Expense Claim, Compelling Payment, and for an Accounting [Docket Number 326]*, dated Aug. 7, 2012, at ¶ 1; *accord* ¶ 7) (ECF Doc. # 459).)

5

Second, Pilatus made the pending motion, which seeks to compel the Debtors to make the assumption/rejection decision regarding the *Agreement* prior to confirmation.[3] Once again, the underlying issue primarily relates to the Debtors' speculation that they may not be using Pilatus's IP in the manufacture and sale of the T-6 Trainer. The Debtors also question whether Pilatus still owns the IP it is purportedly licensing under the *Agreement*. If they do not use Pilatus's IP, the *Agreement* is an unnecessary and expensive burden. (*Debtors' Objection to Pilatus Aircraft Ltd.'s Motion for Order Limiting Time Within Which Debtor Must Assume or Reject Executory Contract*, dated Aug. 27, 2012 ("*Objection*"), at 2-3 (ECF Doc. # 515) ("The critical questions for that determination include whether Pilatus still owns any intellectual property that is being licensed to the Debtors under the Prepetition Agreement and whether the Debtors need that intellectual property to continue manufacturing and selling the T-6 aircraft.").) In addition, the Debtors argued that they were in the midst of negotiations over a plan sponsorship transaction and anticipated marketing process, and "[f]orcing the Debtors to make final, irreversible decisions on material contracts before the plan sponsorship negotiations and marketing processes have the opportunity to run their course could harm the Debtors' ability to obtain the highest and best value for their businesses."[4] (*Id.* at 4.) Finally, Pilatus is not harmed by waiting; it is not expending any sums to perform under the *Agreement*. Furthermore, if the Debtors assume the

---

[3] Neither party has argued that the *Agreement* is not an executory contract.

[4] Since oral argument on the *Motion*, the third-party plan sponsorship transaction the Debtors were pursuing has collapsed. (*See Amended Disclosure Statement* at 30-32.) Although it is theoretically possible for another bidder to emerge, the Debtors are prosecuting the *Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated November 30, 2012 ("*Amended Plan*") (ECF Doc. # 872), which contemplates a stand-alone restructuring. The Court approved the *Amended Disclosure Statement* for the *Amended Plan* on December 5, 2012. (*See Order Approving (I) the Disclosure Statement; (II) The Voting Record Date, Voting Deadline, and Other Dates; (III) Procedures for Soliciting, Receiving, and Tabulating Votes on the Plan and for Filing Objections to the Plan; and (IV) the Manner and Forms of Notice and Other Related Documents*, dated Dec. 5, 2012 ("*DS Approval Order*") (ECF Doc. # 900).)

*Agreement*, they will promptly cure all defaults, and if they reject it at the time of confirmation, Pilatus will have the same rejection damage claim it would have if the Debtors rejected the *Agreement* today.[5] (*Id.*)

## DISCUSSION

### A.    Introduction

Pursuant to 11 U.S.C. § 365(d)(2), the trustee has until plan confirmation to decide whether to assume or reject an executory contract.  On request of the non-debtor party to the contract, the court may order the trustee to assume or reject the contract within a specified time.[6] Section 365(d)(2) is a codification of the bankruptcy jurisprudence that existed prior to its enactment, 3 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 365.05[2][a], at 365-43 (16th ed. 2012) (citing cases), and the settled rule adopted from pre-Bankruptcy Code case law is that the trustee has a reasonable time to make the assumption or rejection decision. *Id.* "What constitutes a reasonable time is left to the bankruptcy court's discretion in the light of the circumstances of each case." *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir. 1982); *accord In re Adelphia Commc'ns. Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003); *In re Teligent, Inc.*, 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001).

---

[5]    Pilatus has agreed to adjourn the *Administrative Claim Motion sine die* pending the outcome of the *Motion*. (*See* Transcript of hearing held on Aug. 30, 2012, at 38, lines 16-21 (ECF Doc. # 554).)

[6]    Section 365(d)(2) states:

> In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

7

Courts have articulated various tests or guidelines that should inform the decision whether to enlarge or reduce a debtor's time to assume or reject an executory contract.[7] In *In re Adelphia Commc'ns,* the court synthesized these decisions and developed a twelve factor test that included the following elements:

1. the nature of the interests at stake;

2. the balance of the hurt to the litigants;

3. the good to be achieved;

4. the safeguards afforded to the litigants;

5. whether the action to be taken is so in derogation of Congress' scheme that the court may be said to be arbitrary;

6. the debtor's failure or ability to satisfy post-petition obligations;

7. the damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code;

8. the importance of the contract to the debtor's business and reorganization;

9. whether the debtor has sufficient time to appraise its financial situation and the potential value of its assets in formulating a plan of reorganization;

10. whether there is a need for judicial determination as to whether an executory contract exists;

11. whether exclusivity has been terminated; and

12. above all, the broad purpose of Chapter 11, which is to permit successful rehabilitation of debtors.

*In re Adelphia Commc'ns*, 291 B.R. at 293 (quotations marks and citations omitted); *accord In re Dana Corp.*, 350 B.R. 144, 147 (Bankr. S.D.N.Y. 2006). These factors are not exhaustive, and depending on the circumstances, there may be other factors that a bankruptcy court should

---

[7] The same factors govern motions to extend or limit the time within which to assume or reject an executory contract. *See In re Enron Corp.*, 279 B.R. 695, 703 (Bankr. S.D.N.Y. 2002).

consider. *See South Street Seaport Limited Partnership v. Burger Boys, Inc. (In re Burger Boys, Inc.)*, 94 F.3d 755, 761 (2d Cir. 1996).  The burden rests with the movant to demonstrate cause. *Dana Corp.*, 350 B.R. at 147.

In the present case, the parties have focused primarily on two considerations touching on several of these factors:  First, have the Debtors had sufficient time to decide whether they need the *Agreement*?  This question implicates *Adelphia* factors 8, 9 and 12.  Hawker speculates that it might no longer be using Pilatus's IP or Pilatus might no longer own whatever IP it is using.  Hawker has characterized this determination as complex, but Pilatus views it as straight-forward.

Second, the parties argue over the relative balance of hurt and the compensability of any injury that Pilatus may suffer.  This involves *Adelphia* factors 2, 4, 6 and 7.  The Debtors are not paying post-petition royalties although their obligation to do so is intertwined with whether Hawker is using Pilatus's IP.  Pilatus argues that allowing Hawker to manufacture and sell the T-6 Trainer using Pilatus's IP without paying current royalties is unfair; it forces Pilatus to fund the operations of one of its competitors during the life of the case.  The Debtors contend that if Hawker assumes the *Agreement* at confirmation, it will have to cure all defaults.  In that event, Pilatus will receive payment of all of its pre-petition claims, if any, and its post-petition claims.  If Hawker rejects the *Agreement*, Pilatus can still recover any administrative claims on the effective date of the plan, and assert the same rejection damage claim it would have if the assumption-rejection deadline was accelerated.

Finally, Pilatus alludes briefly to the good to be achieved by accelerating the assumption-rejection decision and the nature of the interests at stake.  (*Adelphia* factors 1 and 3.)  If Hawker rejects the *Agreement* but continues to manufacture the T-6 Trainer, Pilatus will sue Hawker for

9

injunctive and monetary relief in this or some other court. All parties will suffer if the decision is delayed, and "[i]t is better for all parties involved in the reorganization process for the Debtors to determine on or before the Assumption/Rejection Date whether they intend to assume or reject the [*Agreement*] so that the parties may take the appropriate actions to protect their respective rights and resolve their disputes regarding Pilatus' intellectual property." (*Motion* at ¶ 33.)

**B.     Has Hawker Had Enough Time?**

The decision to assume or reject an executory contract involves the exercise of business judgment. *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993). The Debtors have already determined that they will continue to manufacture and sell the T-6 Trainer after emerging from bankruptcy. It is one of their most valuable products. Instead, the question is whether they need the *Agreement* to do so. Although the Debtors argue that they need more time to make this decision, the evidence suggests that there should be no doubt, and the Debtors offer nothing concrete to indicate that there is.

Beech, Hawker's predecessor, signed the *Agreement* in October 2004, eight years ago. At that time, Pilatus continued to grant Beech a right and license to use the data and inventions of the PC-9 belonging to Pilatus to the extent required by Beech to manufacture, sell and support the BPT or Derivative Aircraft. (*Agreement*, Art. 6.1.) Beech, in turn, agreed to pay Pilatus a royalty for "each BPT or Derivative Aircraft manufactured and sold by Beech." (*Id.*, Art. 4.3(A), (B).) Derivative Aircraft meant aircraft on the same Type Certificate as the BPT. (*Id.*, Art. 1.9.) Both parties acknowledged that they had exchanged proprietary data, and agreed to maintain it in confidence. (*See id.*, Art. 5.1, 5.4.) Beech agreed that the licenses and rights granted by Pilatus could be used solely to manufacture, sell and support the BPT or Derivative Aircraft, and if it

10

stopped manufacturing, selling or supporting the BPT or Derivative Aircraft, the licenses and rights would "immediately terminate." (*Id.*, Art. 6.1.)

Hawker's decision to sign the *Agreement* implies that as of October 2004, Hawker concluded in the exercise of its business judgment that it required Pilatus's IP to manufacture, sell and support the T-6 Trainer. Since then, Hawker has manufactured and sold T-6 Trainers under the same Type Certificate as the BPT. Since then and until shortly before the petition date, Hawker has paid Pilatus the royalties due under the *Agreement*, suggesting its understanding that it was using Pilatus's IP. Furthermore, the Debtors concede that the *Agreement* is executory, and hence, did not "immediately terminate" prior to the petition date because the Debtors stopped using Pilatus's IP.

In light of these facts, one may legitimately question the Debtors' doubts. The Debtors offer no explanation. They have never argued that Beech entered into the *Agreement* under the mistaken belief that it needed Pilatus's IP or that Pilatus owned it. The Debtors do not contend that Hawker now manufactures and sells the T-6 Trainer under a different Type Certificate or uses a different, non-derivative design or technology. The Debtors have not pointed to any relevant IP that Pilatus owned in October 2004, but no longer owns. They do not suggest that Pilatus assigned its rights. They have not identified any Pilatus patents or trade secrets that lapsed, entered the public domain or otherwise became invalid, or any other change since October 2004 that may have altered Pilatus's interests in the IP that it licensed to Hawker at that time. In short, Hawker or its predecessors have been using the same or derivative IP for over twenty years, reaffirmed that use eight years ago, and cannot point to a single thing that has changed. In light of the circumstances, I am skeptical of the Debtors' newly professed doubts, and hence, their contention that they need more time to figure out the answer to these questions.

11

Even if I credited the Debtors' argument, they have now had even more time to determine if they need to assume or should reject the *Agreement*. As noted earlier, the Debtors first raised this argument in early August 2012 when they objected to the *Administrative Claim Motion*. It is now four months later. The *Agreement* may be the single most important agreement relating to the Debtors' single most important product, and their decision whether they need the rights and licenses granted under the *Agreement* should have been among their first and most pressing orders of business. Accordingly, I conclude that the Debtors have had a reasonable amount of time to decide whether to assume or reject the *Agreement,* and *Adelphia* factors 8, 9 and 12 weigh in favor of granting Pilatus's motion.

Furthermore, the Debtors have implicitly conceded that they need only another four weeks to make the assumption/rejection decision. The confirmation hearing is scheduled for January 31, 2013. (*DS Approval Order* at ¶ 6(g).) Section 365(d)(2) of the Bankruptcy Code requires the debtor to assume or reject its executory contracts prior to confirmation. Furthermore, the *Amended Plan* requires the Debtors to file a Plan Supplement ten business days before the voting deadline, which will include a Schedule of Assumed Executory Contracts and Unexpired Leases (the "Assumption Schedule"). (*Amended Plan*, Art. I.A(111).) The entry of the confirmation order shall constitute the approval of the assumption and, if appropriate, the assignment of the executory contracts and unexpired leases listed on the Assumption Schedule. (*Id.*, Art. VI.A.) Subject to certain exceptions, any executory contract or unexpired lease that does not appear on the Assumption Schedule will be deemed rejected. (*Id.*, Art. VI.B.)

The voting deadline is January 22, 2013. (*DS Approval Order* at ¶ 6(d).) Counting backwards, ten business days falls on January 7, 2013 (January 21, 2013 is a federal holiday). Thus, the Debtors have committed themselves to decide which executory contracts they intend to

assume by January 7, 2013, and the actual assumption will occur with the entry of the confirmation order on or shortly after January 31, 2013.

But there is a catch; the actual deadline is open-ended. The *Amended Plan* permits the Debtors to modify the Assumption Schedule prior to the "Effective Date," or to such later date as determined by the Court. (*Id.*, Art. VI.B.) The "Effective Date" is a business day *after* the confirmation date on which no stay of the confirmation order is in effect and all of the condition precedents specified in Article X.A have been satisfied or waived. (*Id.*, Art. I.A(47).) Article X.A includes numerous conditions precedent including the requirement that the confirmation order is final, the exit financing has closed and the treatment of the pension plans is acceptable to certain parties. In short, the Effective Date is open-ended, and there may be a significant gap between the entry of the confirmation order and the Effective Date, including the time needed to resolve any appeals from the confirmation order. During that gap, the Debtors have the absolute right to change their mind about the assumption or rejection of the *Agreement*.

The Debtors' ability to extend the assumption/rejection date beyond the entry of the confirmation order is a question for another day. For present purposes, the Debtors have imposed upon themselves a deadline to file the Assumption Schedule by January 7, 2013. This is strong evidence that they will be in a position to decide whether to assume or reject the *Agreement* by then.

C.     **The Balance of Hurts**

The prejudice to Pilatus of indefinitely delaying the assumption/rejection decision is fairly straight-forward. The Debtors are allegedly using its intellectual property, and they are not paying royalties. In addition, the failure to remit royalty payments is forcing Pilatus to

13

subsidize its direct competitor in the global market. (*Reply* at 4, 12.) The sooner the Debtors decide to assume or the reject the *Agreement*, the sooner Pilatus will (a) in the case of assumption and cure, receive the full amount due under the *Agreement*, or (b) in the case of rejection, commence proceedings to enforce its purported intellectual property rights. (*See Motion* at ¶ 33.)

Any prejudice to Pilatus is compensable under the Bankruptcy Code. The only prejudice caused by delay is the non-payment of royalties accruing post-petition.[8] But Pilatus is entitled to receive payment of its administrative claim, if any, regardless of whether the Debtors assume or reject the *Agreement*. Furthermore, Pilatus has sought to enforce that right through the *Administrative Claim Motion* which does not depend on the timing or outcome of the Debtors' decision to assume or reject the *Agreement*. Although the Court's decision on the pending motion may obviate the need to determine the *Administrative Claim Motion*, that remedy is available to Pilatus, and the successful resolution of that motion will resolve Pilatus's concern that it is subsidizing its competition. If, on the other hand, the Debtors reject the *Agreement*, the Bankruptcy Code grants Pilatus a general unsecured claim, *see* 11 U.S.C. § 365(g)(1), and that claim can only be paid pursuant to a confirmed and effective plan. Thus, although the assumption/rejection decision will determine whether Pilatus has a rejection damage claim, it will not affect the timing of its payment regardless of whether the Debtors reject the *Agreement* today or immediately prior to confirmation.

The Debtors' countervailing arguments regarding the prejudice that they may suffer if forced to accelerate their decision are not particularly compelling. They maintain that they need

---

[8] Pilatus has not indicated whether it holds a pre-petition claim. I would assume that it does not. The Debtors would have to cure any pre-petition claim in the event of assumption, and Pilatus has not argued that the delay has prejudiced it in that respect.

more time to decide, but the Court has already concluded that they have had a reasonable time, and they have agreed to file the Assumption Schedule in early January anyway. They expressed concern over the marketing process, but the marketing process is over. Finally, they fear the floodgates, but any possibility of a flood has ebbed because the Debtors must identify the executory contracts they intend to assume by January 7, 2013. Although the *Amended Plan* allows the Debtors to modify the Assumption Schedule, the Debtors will have to announce their initial assumption/rejection decisions in the next four weeks.

Accordingly, the balance of hurt and the corresponding *Adelphia* factors are neutral.

**D.     The Nature of the Interests at Stake and the Good to Be Achieved**

Although the motion is presented as a two party dispute, it is much broader. If the Debtors reject the *Agreement*, Pilatus will commence a lawsuit to enjoin the Debtors from using its IP and, perhaps, manufacturing and selling the T-6 Trainer. They may also seek preliminary injunctive relief.

The Debtors future prospects likely depend on whether the Debtors can continue to manufacture the T-6 Trainer. Assumption will remove any doubt but rejection may cast a cloud over the Debtors' immediate and long-term future. The Debtors' right to manufacture the T-6 Trainer should be determined at the earliest possible date, and these factors weigh in favor of compelling the Debtors to make the assumption or rejection decision on a specified date rather than at some indefinite time in the future.

**CONCLUSION**

Based on the foregoing, I conclude in the exercise of my discretion that the Debtors should be compelled to decide whether to assume or reject the *Agreement* by a specified date, to

wit, January 7, 2013. Accordingly, the motion is granted to that extent. In the event that the Debtors fail to file a separate motion to assume the *Agreement* by January 7, 2013 and make it returnable no later than January 31, 2013, the *Agreement* will be deemed rejected. Alternatively, the Debtors may file a notice of a stipulation and proposed order assuming the *Agreement* by January 7, 2013.

So ordered.

Dated: New York, New York
       December 7, 2012

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge