UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------X      FOR PUBLICATION
In re:                                                         :
                                                               :
HAWKER BEECHCRAFT, INC., et al.,                               :      Chapter 11
                                                               :      Case No.: 12-11873 (SMB)
                            Debtors.                           :      Jointly administered
---------------------------------------------------------------X
```

## MEMORANDUM DECISION PARTIALLY GRANTING AND
## PARTIALLY DENYING DEBTORS' REJECTION MOTION

**A P P E A R A N C E S :**

KIRKLAND & ELLIS LLP
Attorneys for the Debtors and Debtors in Possession
601 Lexington Avenue
New York, NY 10022

> James H.M. Sprayregen, Esq.
> Paul M. Basta, Esq.
> Patrick J. Nash, Jr., Esq.
> Ross M. Kwasteniet, Esq.
> Of Counsel

AKIN GUMP STRAUSS HAUER & FELD LLP
Attorneys for Official Committee of Unsecured Creditors
One Bryant Park
New York, NY 10036

> Daniel H. Golden, Esq.
> David H. Botter, Esq.
> Alexis Freeman, Esq.
> Of Counsel

CRAVATH, SWAINE & MOORE LLP
Attorneys for Ad Hoc Committee of Hawker 4000 Customers
WorldWide Plaza, 825 Eighth Avenue
New York, NY 10019

> Richard Levin, Esq.
> Of Counsel

WACHTELL, LIPTON, ROSEN & KATZ
Attorneys for Ad Hoc Group of Senior Lenders
51 West 52nd Street
New York, NY 10019

       Richard G. Mason, Esq.
           Of Counsel

GREENBERG TRAURIG, LLP
Attorneys for Rotorwing B.V.
200 Park Avenue
New York, NY 10166

       Denise J. Penn, Esq.
           Of Counsel

KEMP KLEIN
Attorneys for Pace Aviation, LLC
201 West Big Beaver Road, Suite 600
Troy, MI 48084

       Norman D. Orr, Esq.
           Of Counsel

CAHILL GORDON & REINDEL LLP
Attorneys for Biozyme Incorporated
Eighty Pine Street
New York, NY 10005

       Richard A. Stieglitz Jr.
           Of Counsel

LEWIS GLASSER CASEY & ROLLINS, PLLC
Attorneys for RCS Holdings, LLC
300 Summers Street, Suite 700
P.O. Box 1746
Charleston, WV 25326

       Spencer D. Elliott, Esq.
           Of Counsel

HOGAN LOVELLS US LLP
Attorneys for Elegant Aviation Limited
875 Third Avenue
New York, NY 10022

       Peter A. Ivanick, Esq.
       Hugh F. Hill, Esq.
           Of Counsel

BARNES & THORNBURG LLP
Attorneys for McGrath Air, LLC
171 Monroe Avenue, NW, Suite 1000
Grand Rapids, MI 49503

       John T. Gregg, Esq.
          Of Counsel


**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

       The Debtors (collectively "Hawker" or "HBC"), manufacture, sell and service jet and non-jet aircraft.  Hawker plans to terminate most of its jet aircraft production business, and has moved to reject certain agreements relating to the Hawker 4000 and Premier I and IA (collectively, "Premier") jet aircraft that impose continuing warranty and support obligations. (*See Motion for Entry of An Order Authorizing the Debtors to Reject Certain Aircraft Warranty and Support Obligations Related to Hawker 4000 and Premier I and IA Jets Effective as of November 15, 2012*, dated Nov. 15, 2012 ("*Rejection Motion*") (ECF Doc. # 777).)  Various parties filed objections, but all save two have been withdrawn.  For the reasons that follow, the *Rejection Motion* is granted in part and denied in part.

**BACKGROUND**

**A.**      **The Purchase Agreements**

       At all relevant times, Hawker was engaged in the manufacture, sale and servicing of jet and non-jet special mission and trainer-attack aircraft.  (*See Amended Disclosure Statement for Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated Nov. 28, 2012 ("*Amended Disclosure Statement*"), at 1 (ECF Doc. # 849).)  When Hawker sold a new Hawker 4000 or Premier jet, the purchase agreement included a limited

warranty that covered defects in materials and workmanship (the "Limited Warranty").[1]  (*See Premier Purchase Agreement* at *Specification and Description*, § 20; *Hawker 4000 Purchase Agreement* at *Specification and Description*, § 24.)  The Limited Warranty included terms and conditions that, among other things, required that the customer (1) maintain, operate and store the aircraft in accordance with certain manuals and other written instructions, (2) not remove certain identifying marks and serial numbers from the aircraft, or alter the aircraft other than as allowed under the warranty and (3) not use the aircraft for unspecified purposes.  (*Premier Purchase Agreement* at *Specification and Description*, § 20; *Hawker 4000 Purchase Agreement* at *Specification and Description*, § 24.)  The typical Limited Warranty lasted anywhere between five to ten years or 3,000 to 10,000 air flight miles, depending on the aircraft model type.[2]

The Hawker 4000 and Premier Purchase Agreements also imposed duties on the customer unrelated to the Limited Warranty.  For example, Hawker agreed to provide training for two qualified pilots and two qualified maintenance personnel.  (*Premier Purchase Agreement* at *Specification and Description*, § 21; *Hawker 4000 Purchase Agreement*, at *Specification and Description*, § 25.)  In return, the customer agreed to indemnify and hold Hawker harmless for "any . . . liabilities [or] claims . . . including any claims for damage to the Aircraft . . . (excluding however, any liability or claim relating to the manufacture of the Aircraft and except the

---

[1]      *See Premier I and IA Aircraft Purchase Agreement* ("*Premier Purchase Agreement*")*, attached as Exhibit A1 to Debtors' Brief in Support of the Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Aircraft Warranty and Support Obligations Related to Hawker 4000 and Premier I and IA Jets Effective as of November 15, 2012, dated Dec. 21, 2013* ("*Brief in Support*"); *Hawker 4000 Aircraft Purchase Agreement* ("*Hawker 4000 Purchase Agreement*"), attached as Exhibit A2 to the *Brief in Support*, (collectively "*Aircraft Purchase Agreements*") (ECF Doc. # 971).  In some cases, the manufacturer of a component or system (engine, avionics) provided its own warranty and that warranty is not affected by the *Rejection Motion*.  (*Rejection Motion* at ¶ 8.)

[2]      The Premier Limited Warranty ran for five years or 3,000 hours of aircraft operation, whichever occurred sooner, and the Hawker 4000 Limited Warranty lasted for ten years or 10,000 hours of aircraft operation, whichever occurred sooner.  (*See Premier Purchase Agreement* at *Specification and Description*, § 20; *Hawker 4000 Purchase Agreement* at *Specification and Description*, § 24; *Brief in Support* at 5 n.14.)

4

negligence or willful misconduct of Seller and their respective officers, employees, agents, and insurers) and all expenses in connection therewith (including reasonable counsel fees) arising directly or indirectly out of or in connection with the use of the Aircraft for the training described above." (*Premier Purchase Agreement* at *Specification and Description*, § 21; *Hawker 4000 Purchase Agreement* at *Specification and Description*, § 25.) In addition, the customer agreed to "comply with all export control laws and regulations . . . that apply to the Aircraft . . . and indemnify Seller from and against the consequences of any failure by Buyer to comply with all applicable laws and regulations." (*Aircraft Purchase Agreements* at *General Terms and Conditions*, § 15.)[3] The customer agreed that its rights under the Aircraft Purchase Agreement "may not be assigned, in whole or in part without Seller's written consent." (*Id.* at *General Terms and Conditions*, § 27.) Finally, the customer agreed that, "the terms and conditions of this Agreement . . . may not be disclosed in any fashion, either in whole or in part, by Buyer to any third party . . . without the prior written consent of Seller." (*Id.* at *General Terms and Conditions*, § 29.)

The parties further agreed that the material breach of any term or condition permitted Hawker to terminate the Aircraft Purchase Agreement:

> Buyer's Default. Subject to a ten day cure period, Seller has the right to terminate this Agreement and retain all deposits previously paid by Buyer as liquidated damages if Buyer:
>
> . . . .
>
> (E)   breaches any term or condition contained in this Agreement in any material respect.

(*Id.* at *General Terms and Conditions*, § 25.)

---

[3]       The two *Aircraft Purchase Agreements* included identical *General Terms and Conditions*.

B.    **The Support Plus Program**

Hawker also offered a program that covered scheduled and unscheduled maintenance and replacement of consumable parts for the aircraft (the "Support Plus Program").[4]  Under the Premier Support Plus Program, the customer agreed to pay Hawker for each period of twelve consecutive calendar months "the greater of actual aircraft flight time or a minimum service charge based upon an annual minimum of 200 flight hours," (*Premier Support Plus Agreement* at Art. II, § 4.1), multiplied by the Hourly Rate.  (*Id.* at Art. II, § 4.3.1.)  The customer was required to report its total aircraft utilization each month, (*id.* at Art. II, § 4.1.1), and pay for "all additional flight hours, over and above any pre-paid flight hours, at the applicable rate for the balance of the Term [of the Support Plus Program]."  (*Id.* at Art. II, § 4.3.2.)  In addition, the Premier Support Plus Agreement required the customer to pay numerous other charges.  (*E.g. id.* at Art. IV, §1 *et seq.*)    The customer also had to properly record various items of information in the aircraft log book and furnish the information and grant access to Hawker upon reasonable request.  (*Id.* at Art. IV, § 1.13.1.)  Finally, the customer agreed to notify Hawker of any letters of investigation or notices from any airworthiness authority, or any self-disclosure made to such an authority, relating to maintenance services provided under the Premier Support Plus Program. (*Id.* at Art IV, § 1.1.2.)

The Hawker 4000 Support Plus Program differed in only one material respect; the customer pre-paid for selected parts and labor coverage for scheduled and unscheduled maintenance.  (*Hawker 4000 Support Plus Agreement*, at Art. II, § 1.1.)  The pre-payment

---

[4]        *See Hawker Beechcraft Corporation Support Plus Sample Agreement for Beechcraft Owner* [of Premier Aircraft], attached as Exhibit B1 to the *Brief in Support* ("*Premier Support Plus Agreement*"); *Hawker Beechcraft Corporation Pre-Paid Support Plus Sample Agreement For <Hawker 4000 Owner>* ("*Hawker 4000 Support Plus Agreement*"), attached as Exhibit B2 to the *Brief in Support*.

assumed that the aircraft operated "an average of 1.25 flight hours per landing . . . [but] if the

Aircraft average flight hours to landings is less than 1.25 flight hours per landing in any twelve

(12) month period from the effective date . . . HBC will invoice the Owner an Excess Landing

Charge for each hour flown in the prior twelve (12) month period." (*Id.* at Art. II, §§ 3.1.2-

3.1.3.) The customer was required to submit monthly utilization reports, (*id.* at Art. V, § 1.1),

and pay any excess charges plus appropriate interest. (*See id.* at Art. V, §§ 1.2, 1.3.) As with the

Premier Support Plus Program, the customer had to maintain an aircraft logbook and provide the

same access to Hawker, (*id.* at Art. IV, § 1.13.1), pay certain additional charges, (*id.* at Art. IV),

and notify Hawker regarding any letters of investigation and notices from, and self-disclosures

to, airworthiness authorities concerning the maintenance services provided under the Hawker

4000 Support Plus Program. (*Id.* at Art. IV, § 1.1.2.)

Both Support Plus Program agreements gave Hawker similar rights in the event the

customer breached any of its obligations. Hawker could terminate the Support Plus Program

agreement, and if the breach included non-payment and Hawker was forced to sue, Hawker

could recover its reasonable attorneys' fees, expenses and costs. (*Premier Support Plus

Agreement*, at Art. V, § 2.2.1; *Hawker 4000 Support Plus Agreement*, at Art. V, §§ 1.4, 2.2.1.)

## C.    Other Warranty Programs

Hawker also provided an "Upgrade and Enhancement Program" offered only for Hawker

4000 aircraft to improve their overall performance and to maintain compliance with certain

Federal Aviation Administration requirements, and a "Post Delivery Commitments" program for

post-delivery repair work on various aircraft. (*Rejection Motion* at ¶ 8.)

D.      **The Bankruptcy**

1.      **First Day Motions**

On May 3, 2012, Hawker filed voluntary chapter 11 petitions with the goal of

implementing a consensual debt-to-equity recapitalization and emerging as a standalone

company.  (*See Amended Disclosure Statement* at 1.)  Toward that end, Hawker had entered into

a *Restructuring Support Agreement* ("*RSA*") with its Senior Secured Lenders and Senior

Noteholders.  (*See RSA* at 1, attached as Exhibit A (pp. 60-84 of 245) to the *Declaration of*

*Robert S. Miller (I) In Support of Debtors' Chapter 11 Petitions and First Day Motions and (II)*

*Pursuant to Local Bankruptcy Rule 1007-2*, dated May 4, 2012 ("*Miller Declaration*") (ECF

Doc. # 22).)  The *RSA* permitted Hawker to market its assets and propose a plan involving a sale

transaction with a third party.  (*See id.* at 14; *Amended Disclosure Statement* at 29-31.)

Simultaneously with the filing of the petitions, Hawker moved to continue certain

Customer Programs, including the Limited Warranty and Support Plus Programs.  (*See Debtors'*

*Motion for the Entry of Interim and Final Orders Authorizing the Debtors to Honor Certain*

*Prepetition Obligations to Customers and Otherwise Continue Certain Customer Programs and*

*Practices in the Ordinary Course of Business*, dated May 3, 2012 ("*Motion to Honor*") (ECF

Doc. # 5).)  Hawker explained that the Limited Warranty was "critically important" to its

"ongoing viability," and since "competitors offer coverage of similar scope, and customers

generally expect such programs to be available to reduce operating risk when purchasing an

aircraft," Hawker "would be at a significant competitive disadvantage if it were unable to

continue to perform" under this warranty.  (*Motion to Honor* at ¶ 9.)  Likewise, many of

Hawker's competitors offered a program similar to the Support Plus Program, and if Hawker was

not able to continue honoring its existing Support Plus Program obligations, its "relationship

with many existing customers would be severely damaged, and prospective customers would lose faith in the Support Plus Program."  (*Id.* at ¶ 15.)

Hawker's Chief Executive Officer Robert S. Miller amplified Hawker's reasoning explaining that "in order to ensure continuing customer loyalty and a successful reorganization" it is "essential" that Hawker

> be permitted to honor, without interruption, obligations related to their Customer Programs [including the Limited Warranty and Support Plus Program] in accordance with their prepetition practices and customers' expectations. Any interruption or discontinuation of the Customer Programs risks the permanent loss of certain customers. The aggregate cost to the Debtors to continue the Customer Programs and perform and honor prepetition obligations with respect thereto is insignificant when compared to the enormous detrimental impact their business would suffer if these programs are suspended or abandoned.

(*Miller Declaration* at ¶ 93.)

On May 4, 2012, the Court entered an interim order permitting Hawker to continue the Customer Programs, including the Limited Warranty and Support Plus Program, (*Interim Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and Otherwise Continue Certain Customer Programs and Practices in the Ordinary Course of Business*, dated May 4, 2012 ("*Interim Order to Honor*") (ECF Doc. # 44)), which was followed by a final order on May 30, 2012.  (*Final Order Authorizing the Debtors to Honor Certain Prepetition Obligations to Customers and Otherwise Continue Certain Customer Programs and Practices in the Ordinary Course of Business*, dated May 30, 2012 ("*Final Order to Honor*") (ECF Doc. #179).)   Both orders provided that "[t]he Debtors are authorized, but not directed, in their sole discretion, to honor and perform under the Customer Programs and any other obligation relating to the Debtors' customary business practice, without regard to whether the Debtors' Customer Programs arose before or after the Petition Date."  (*Interim Order to Honor* at ¶ 3; *Final Order*

*to Honor* at ¶ 2.)  Both orders also provided that the *Motion to Honor* did not request assumption

of any contract, the orders did not authorize the assumption of any contract and Hawker reserved

all of its rights.  (*See Interim Order to Honor* at ¶ 6; *Final Order to Honor* at ¶ 6.)

### 2.    The Plan

During the course of the case, Hawker pursued a possible third party transaction with

Superior Aviation Beijing, Co., Ltd. ("Superior"), a China-based company.  That proposal would

have involved the sale of some or all of Hawker's jet product lines.  When that transaction fell

through, Hawker filed its amended plan proposing a stand-alone plan under which Hawker will

cease production of the Hawker 4000 and Premier jet aircraft business and no longer honor the

warranty and support obligations covering these product lines.  (*Amended Disclosure Statement*

at 37; *see Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the*

*Bankruptcy Code*, dated Nov. 30, 2012 ("*Amended Plan*") (ECF Doc. # 872).)  The amended

plan also provides that any executory contract that is not assumed will be deemed rejected.

(*Amended Plan* at 33.)

### 3.    The *Rejection Motion*

Notwithstanding the latter provision, Hawker filed a separate motion to reject the Aircraft

Purchase Agreements[5]  and Support Plus Agreements for the Hawker 4000 and Premier aircraft

and certain other warranty and support agreements.  Hawker's restructuring expert Scott

Brubaker of Alvarez & Marsal North America explained that while continuing these Customer

Programs was initially necessary to maintain the "status quo" for its customers and to minimize

---

[5]      Although the *Rejection Motion* focuses on the Limited Warranty, the Limited Warranty is part of the
Aircraft Purchase Agreement.  Hence, the *Rejection Motion* is properly viewed as being directed at the Aircraft
Purchase Agreements.

disruptions, the *Motion to Honor* was not intended to "permanently bind" Hawker to these

programs, (*see Declaration of Scott Brubaker in Support of Debtors' First Omnibus Motion for

Entry of an Order Authorizing the Debtors to Reject Certain Aircraft Warranty and Support

Obligations Related to Hawker 4000 and Premier I and IA Jets Effective as of November 15,

2012*, dated Dec. 10, 2012 ("*Brubaker Declaration*") at ¶ 3),[6] and their continuation "would

otherwise place substantial burden on the Debtors' estates for years to come and that these costs

would otherwise outweigh any net benefit the Debtors would receive from maintaining the

contractual obligations."  (*Id.* at ¶ 4.)  Brubaker estimated that Hawker's current projected

liability through 2017 on the Premier Limited Warranty ranged between $5 million and $17

million, while similar projections regarding the Premier Support Plus Program ranged between

zero (*i.e.*, break even) and $60 million.  (*See Tr.* at 44.)  On the Hawker 4000 side, the projected

cost of the Limited Warranty fell between $28 million and $100 million, and Brubaker estimated

that the Support Plus Program would cost Hawker between $32 million and $65 million.  (*Id.* at

45.)  The substantial ranges in liability, which were greater than the corresponding costs

estimated at the time of the *Motion to Honor*, were primarily due to the difficulty in predicting

the availability and costs of replacement parts after Hawker stopped manufacturing these aircraft.

(*Id.* at 62-63.)  Hawker also considered other factors, including the possible loss of non-warranty

related business, (*Id.* at 48, 64), and the related loss of good-will.  (*Id.* at 51.)  To ease the burden

on its customers, Hawker stated its intention to work to reach an agreement with third party

companies to "enhance the likelihood that owners of Hawker 4000 and Premier I and IA aircraft

---

[6]    The *Brubaker Declaration* is attached as Exhibit A to the *Debtors' Omnibus Reply to Objections to the
Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Aircraft Warranty
Obligations Related to Hawker 4000 and Premier I and IA Jets Effective as of November 15, 2012*, dated Dec. 10,
2012 (ECF Doc. #908).  The *Brubaker Declaration* was received without objection as Brubaker's direct testimony.
(*See Transcript of Hearing, held Dec. 11, 2012 ("Tr.")*, at 40 (ECF Doc. # 935).)

are able to purchase necessary service and maintenance on their aircraft in the future."

(*Rejection Motion* at 6-7.)  Post-rejection, Hawker would continue to provide fee-based

maintenance and support services to the extent practicable through Hawker-owned and affiliated

service centers.  (*Id*.)  Additionally, Premier customers who had prepaid for Support Plus

Programs would receive a pro-rated credit for parts and services to be used at a Hawker service

center.  (*Id*.)

Six entities filed objections to the *Rejection Motion*: Pace Aviation, LLC ("Pace"),[7]

McGrath Air, LLC ("McGrath"),[8] RCS Holdings, LLC ("RCS"),[9] Biozyme Incorporated

("Biozyme"),[10] Elegant Aviation Limited ("Elegant")[11] and Rotorwing, B.V. ("Rotorwing").[12]

Virtually all of the objectors argued that the Limited Warranty and Support Plus Programs were

not executory because the buyer had no further duties.  Hence, they were not subject to rejection

under 11 U.S.C. § 365.  Several asserted that Hawker should be judicially estopped from now

taking the position that it made business sense to reject the warranty and support obligations in

---

[7]    *Limited Objection of Pace Aviation, LLC to Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Aircraft Warranty and Support Obligations Related to Hawker 4000 and Premier I and IA Jets Effective as of November 15, 2012*, dated Dec. 3, 2012 ("*Pace Objection*") (ECF Doc. # 875).

[8]    *Objection of McGrath Air, LLC to Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Aircraft Warranty and Support Obligations Related to Hawker 4000 and Premier I and IA Jets Effective as of November 15, 2012*, dated Dec. 3, 2012 ("*McGrath Objection*") (ECF Doc. # 876).

[9]    *Objection of RCS Holdings, LLC to Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Aircraft Warranty and Support Obligations Related to Hawker 4000 and Premier I and IA Jets Effective as of November 15, 2012*, dated Dec. 4, 2012 ("*RCS Objection*") (ECF Doc. # 884).

[10]    *Objection of Biozyme Incorporated to Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Aircraft Warranty and Support Obligations Related to Hawker 4000 and Premier I and IA Jets Effective as of November 15, 2012*, dated Dec. 4, 2012 ("*Biozyme Objection*") (ECF Doc. # 885).

[11]    *Joinder of Elegant Aviation Limited in Objections to the Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Aircraft Warranty and Support Obligations Related to Hawker 4000 and Premier I and IA Jets Effective as of November 15, 2012*, dated Dec. 4, 2012 (ECF Doc. # 889).

[12]    *Objection of Rotorwing, B.V. to Debtors' First Omnibus Motion for Entry of an Order Authorizing the Debtors to Reject Certain Aircraft Warranty and Support Obligations Related to Hawker 4000 and Premier I and IA Jets Effective as of November 15, 2012*, dated Dec. 4, 2012 ("*Rotorwing Objection*") (ECF Doc. # 890).

light of the position it took at the time of the *Motion to Honor*.  In addition, McGrath, owner of a Premier aircraft, asserted that it entered into the Support Plus Agreement after the petition date, and the post-petition agreement was not subject to rejection.  (*Id*. at ¶ 16.)  RCS, owner of a Premier aircraft, contended that Hawker improperly discriminated by rejecting some of the warranty and support obligations instead of ratably reducing all of them.  (*RCS Objection* at 2-3.)  Biozyme, the owner of a Premier aircraft under Limited Warranty and participant in the Support Plus Program, argued that Hawker's business judgment should be subjected to a heightened standard because the decision to reject the Limited Warranty and Support Plus Program obligations implicated aircraft safety.  (*Biozyme Objection* at ¶¶ 6-8.)  Thus, the Court should "consider the potential direct, negative consequences of the proposed rejection on public safety, which should be readily apparent for airplanes that are no longer covered by warranties or for which necessary parts and/or service may no longer be available (or are only available at significantly-higher costs)."  (*Id*. at ¶ 6.)

Rotorwing, the final objector, was in an entirely different position.  Rotorwing, a Netherlands entity, contended that it was not served properly with the *Rejection Motion*.  In addition, it is the lessee of a Premier aircraft that was purchased as a resale, (*i.e.* Rotorwing's predecessor purchased a "used" aircraft from Hawker), without the Limited Warranty that came with the purchase of a new aircraft.  Instead, the warranty, discussed below, is much more limited, and Rotorwing maintained that it was not executory.

Pace, McGrath, Biozyme and Elegant have withdrawn their objections, and the only remaining objections are those asserted by RCS and Rotorwing.

## DISCUSSION

### A.    Introduction

Section 365(a) states that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The Bankruptcy Code does not define the term "executory contract."  *COR Route 5 Co. v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 379 (2d Cir. 2008).  The legislative history regarding this section states that "[t]hough there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides."  H.R. REP. NO. 95-595, at 347 (1977); S. REP. NO. 95-989, at 58 (1978); *accord NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984); *Penn Traffic*, 524 F.3d at 379; *E. Air Lines, Inc. v. Ins. Co. of Penn. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 998-99 (2d Cir. 1996).  Generally, executoriness is determined as of the petition date.  *Penn Traffic*, 524 F.3d at 381.  Although the Second Circuit has thus far found it unnecessary to define the contours of the test for executoriness, *id.* at 379, most courts and scholars have looked to the test first articulated by Professor Vern Countryman.  *ReGen Cap. I, Inc. v. Halperin (In re U.S. Wireless Data, Inc.)*, 547 F.3d 484, 488 n. 1 (2d Cir. 2008); *Penn Traffic*, 524 F.3d at 379; *Route 21 Assocs. of Belleville, Inc. v. MHC, Inc.*, No. 12 Civ. 5361(PAE), 2012 WL 6625280, at *5 (S.D.N.Y. Dec. 19, 2012).  According to the Countryman definition, an executory contract is

> a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.

Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973); *accord Penn Traffic*, 574 F.2d at 379.

14

Under Countryman's "material breach" test, a prepetition contract is executory when both sides are still obligated to render substantial performance, *Enter. Energy Corp. v. United States (In re Columbia Gas Sys. Inc.)*, 50 F.3d 233, 239 (3d Cir. 1995); *Mitchell v. Streets (In re Streets & Beard Farm P'ship)*, 882 F.2d 233, 235 (7th Cir. 1989); *In re 375 Park Ave. Assocs.*, 182 B.R. 690, 697 (Bankr. S.D.N.Y. 1995), and contingent obligations are sufficient to render a contract executory. *In re Safety-Kleen Corp.*, 410 B.R. 164, 168 (Bankr. D.Del. 2009) (citing cases). If performance remains due on only one side, the contract is not executory, and hence, neither assumable nor capable of rejection. *In re Riodizio, Inc.*, 204 B.R. 417, 421 (Bankr. S.D.N.Y. 1997); *see In re Chateaugay Corp.*, 102 B.R. 335, 345 (Bankr. S.D.N.Y. 1989). The materiality of the breach is a question of state law.[13] *See Columbia Gas*, 50 F.3d at 240 n.10.

In applying Countryman's "material breach" test, one must distinguish between a failure of condition and a breach of duty. "Non-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur." RESTATEMENT (SECOND) OF CONTRACTS § 225(3) (1981); *accord Columbia Gas*, 50 F.3d at 241. Thus, "while a contracting party's failure to fulfill a condition excuses performance by the other party whose performance is so conditioned, it is not, without an independent promise to perform the condition, a breach of contract subjecting the nonfulfilling party to liability for damages." *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.*, 460 N.E.2d 1077, 1081-82 (N.Y. 1984) (citing RESTATEMENT (SECOND) OF CONTRACTS § 225(1) & (3)); *accord Columbia Gas*, 50 F.3d at 241. Nevertheless, a contract party may impliedly promise to use reasonable efforts to cause the condition to occur

---

[13]    The Aircraft Purchase Agreements and the Support Plus Agreements are governed by Kansas Law. Under Kansas law, "[a] material breach is one in which the promisee receives something substantially less or different than he or she bargained for. a material breach occurs where the failure to perform is so substantial that it defeats the parties' object in making the agreement." *Dexter v. Brake*, 269 P.3d 846, 856 (Kan. Ct. App. 2012).

when its occurrence is within the control of that party.  JOSEPH M. PERILLO, CALAMARI &

PERILLO ON CONTRACTS § 11.11, at 368-69 (6th ed. 2009).

The current dispute fulfills the prophecy, at least in the case of a rejection motion, that the

time expended searching for executoriness can be spent more fruitfully doing almost anything

else.  *See Riodizio*, 204 B.R. at 419.  Rejection signifies that the debtor will breach the contract

and not perform.  *Penn Traffic*, 524 F.3d at 378.  If the contract is executory and the debtor

rejects it, the non-debtor party is left with a pre-petition unsecured claim for breach of contract.

*Id.*; *In re Child World, Inc.*, 147 B.R. 847, 852 (Bankr. S.D.N.Y. 1992); *see* 11 U.S.C. §

365(g)(1).  If, on the other hand, the contract is not executory and the debtor chooses not to

perform, the non-debtor party gets the same pre-petition claim for breach of contract.  *See In re*

*Bradlees Stores, Inc.*, No. 02 Civ. 0896(WHP), 2003 WL 76990, at *3 (S.D.N.Y. Jan. 9, 2003),

*aff'd*, 78 F. App'x. 166 (2d Cir. 2003); *Pearl -Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266

B.R. 575, 582 (S.D.N.Y. 2001); *Riodizio*, 204 B.R. at 424 n. 6.  In other words, the rejection of

an executory contract is the economic equivalent of the debtor's refusal to perform a non-

executory contract giving rise to the same unsecured claim.  The only practical difference

concerns the deadline for filing the non-debtor contract party's unsecured claim.  If the breached

contract is not executory, the non-debtor party must file its breach claim by the general bar date.

If the contract is executory and rejected, the non-debtor party will get additional time to file its

rejection damage claim if the bar date has already expired.  *See* FED. R. BANKR. P. 3003(c)(3)

(incorporating FED. R. BANKR P. 3002(c)(4)).  Ironically, a non-debtor contract party who

convinces a bankruptcy court that its contract is not executory and has not yet filed a proof of

claim may find that its claim is time-barred.

16

The *Rejection Motion* was unnecessary for an additional reason.  Hawker's plan provides that unless an unexpired contract is expressly assumed, it will be deemed rejected.  *See* 11 U.S.C. § 1123(b)(2) (a plan may provide, subject to Bankruptcy Code § 365, "for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section.").  If Hawker does not expressly assume the contracts containing the Hawker 4000 and Premier warranty and support obligations, they will be deemed rejected upon confirmation without regard to the *Rejection Motion*.  And if the obligations are not executory, as most of the objecting parties contended, Hawker would not have to do anything.  In that case, the obligees would hold pre-petition claims for breach.  While the *Rejection Motion* makes clear to these obligees that Hawker will not honor these Hawker 4000 and Premier Customer Programs, the *Amended Disclosure Statement* sent the same message.

Despite the conclusion that the *Rejection Motion* was unnecessary, Hawker made it, the remaining objectors objected to it and the Court must decide it.  No one disputes that Hawker had material unfulfilled Hawker 4000 and Premier Limited Warranty and Support Plus Program obligations as of the petition date.  Instead, the question is whether the non-debtor contract parties did too.  Certain of the objectors imply that warranty obligations are not or cannot be executory, citing *In re GEC Indus., Inc.*, 107 B.R. 491 (Bankr. D. Del. 1989) and *In re Shada Truck Leasing, Inc.*, 31 B.R. 97 (Bankr. D. Neb. 1983).  So sweeping a statement cannot be right because the question of executoriness depends on the terms of the agreement containing the warranty or support obligations.  Thus, without commenting on the correctness of the objectors' authorities, they are inapposite and do not provide guidance in deciding the issues presented by the *Rejection Motion*.

17

**B.     Executoriness**

**1.     Aircraft Purchase Agreements**

As discussed earlier, the Aircraft Purchase Agreements impose numerous terms and

conditions on the buyer of an aircraft; some of these terms and conditions do not necessarily

relate to the Limited Warranty obligations.  Nevertheless, because a debtor must assume or reject

an entire contract, and cannot cherry-pick the provisions it does not like, a court must consider

the entire agreement.  Some of the terms in the Aircraft Purchase Agreements appear to be

conditions rather than duties; their non-occurrence may excuse Hawker's performance but do not

constitute breaches, let alone material breaches, of these agreements.  For example, Hawker may

be discharged from honoring the Limited Warranty if the customer fails to maintain, operate or

store the aircraft in accordance with certain manuals and other written instructions.

Nevertheless, the buyer does not undertake a duty to Hawker to maintain, operate or store the

aircraft in any particular manner, and Hawker does not suffer an injury if the buyer does so in a

manner inconsistent with Hawker's manuals and instructions.

Other obligations, however, clearly impose duties on the buyer.  As discussed, the buyer

must indemnify Hawker under certain circumstances in connection with the pilot and crew

training program or if it fails to comply with export control regulations, it must follow certain

protocols with respect to the assignment of its rights, and it must maintain the terms and

conditions of the Aircraft Purchase Agreement in confidence.  Ordinarily, the materiality of these

promises would be a question of fact requiring a trial.  *Almena State Bank v. Enfield*, 954 P.2d

724, 727-28 (Kan. Ct. App. 1998).  However, if the parties contractually agree that some or all of

the terms are sufficiently important to discharge any further obligations imposed on the party

aggrieved by a breach, their intent will govern.  *See Gen. Datacomm Indus., Inc. v. Arcana (In re*

18

*Gen. Datacomm Indus., Inc)*, 407 F.3d 616, 623-24 (3d Cir. 2005) (provision in Benefit Plan that

allowed corporation to terminate the employee's rights if he failed to comply with certain

covenants, including the agreement not to compete and to maintain confidentiality, rendered

those covenants material); *Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 495 A.2d

66, 75 (N.J. 1985) (enforcing provision in franchise agreement that rendered underreporting of

sales a material breach of contract that allowed franchisor to terminate franchise and sue for

damages); 23 RICHARD A. LORD, WILLISTON ON CONTRACTS § 63:3 (4th ed. 2002) ("Where the

contract itself is clear in making a certain event a material breach of that  contract, a court must

ordinarily respect that contractual provision."); *cf. Dexter v. Drake*, 269 P.3d at 856 ("The

doctrine of substantial performance does not apply where the parties, by the terms of their

agreement, make it clear that only complete performance will be satisfactory.").

Here, the parties contractually agreed that the buyer's material breach of any term, even

an immaterial term, would allow Hawker to terminate the Aircraft Purchase Agreement and sue

for specific performance.  The failure to indemnify Hawker or maintain the confidentiality of the

terms and conditions of the Aircraft Purchase Agreement would constitute material breaches of

the indemnity and confidentiality provisions.  Similarly, the assignment of the Aircraft Purchase

Agreement without Hawker's written consent was prohibited and would materially breach that

provision.  (*See Aircraft Purchase Agreement,* at *General Terms and Conditions*, § 27(A).)   In

short, a buyer could commit a material breach of the Aircraft Purchase Agreement even after

delivery of the aircraft that would allow Hawker to terminate the agreement and sue.

Accordingly, the Aircraft Purchase Agreements are executory.

### 2.    Support Plus

The Support Plus Agreements are also executory.  The Premier customer must make

periodic payments.  The Hawker 4000 customer pre-paid for the Support Plus Program, but was

still obligated to pay an Excessive Landing charge if the ratio of flight time to landings fell

below a certain number.  In addition, the buyers under both programs had additional obligations,

including submitting utilization reports, paying various other charges, maintaining a logbook,

providing access to Hawker and reporting certain airworthiness issues relating to the

maintenance performed under the Support Plus Program.  If the customer fails to pay as required

and Hawker sues to recover the unpaid charges, the customer is also liable for Hawker's

reasonable attorneys' fees, costs and expenses.  Finally, Hawker has the right to terminate the

Support Plus Agreement if the customer breaches any of the terms or conditions, including these

affirmative duties.

### 3.    Other Warranties

Immediately following the hearing, the Court denied the *Rejection Motion* to the extent of

Customer Programs other than those pertaining to the Hawker 4000 and Premier Limited

Warranty and Support Plus Program.  Hawker failed to produce the other underlying Customer

Program agreements, and hence, failed to demonstrate that they were executory.  (*Tr.* at 67-68.)

### C.    Business Judgment

The decision to assume or reject an executory contract involves the exercise of business

judgment.  *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993).  Here, Hawker

demonstrated that the decision to reject the Limited Warranty and Support Plus Programs

represents the exercise of sound business judgment, flowing naturally from the decision, which

no one questions, to stop manufacturing and selling the Hawker 4000 and Premier aircraft.  The

20

decision to stop manufacturing may cause parts manufacturers to withdraw from the market or

deal with Hawker on less favorable terms.  At the high end, it could cost Hawker more than $240

million to perform these obligations through 2017.  Hawker also considered the possible cost of a

spill over loss of business, and the decision reflects Hawker's business judgment that the benefits

of rejection outweigh the benefits of performance.

This conclusion necessarily rejects the argument that Hawker must show something more

than ordinary business judgment because the operation of aircraft involves public safety.  No

cases are cited suggesting that the decision to reject an aircraft warranty or maintenance

agreement is subject to a higher standard.  Nor does the decision to reject conflict with any

federal statutory or regulatory scheme governing aircraft.  The aircraft owner—not the

manufacturer—bears the responsibility for maintaining the aircraft.  *See* 14 C.F.R. § 91.403(a)

(2012) ("The owner or operator of an aircraft is primarily responsible for maintaining that

aircraft in an airworthy condition . . . ."); *Id.* § 91.405(a) ("Each owner or operator of an

aircraft—[s]hall have that aircraft inspected as prescribed in subpart E of this part and shall

between required inspections, except as provided in paragraph (c) of this section, have

discrepancies repaired as prescribed in part 43 of this chapter"); *Id.* § 91.7(a) (providing that "no

person may operate a civil aircraft unless it is an airworthy condition"); *Id.* § 91.7(b) (providing

that "the pilot in command of a civil aircraft is responsible for determining whether the aircraft is

in condition for safe flight.").

The argument also makes no sense given the limited nature of the limited nature of the

warranty and support obligations.  They will eventually expire.  The owners will then have to

pay for maintenance and support, or stop flying their aircraft.  Hawker's decision not to honor

the Hawker 4000 and Premier Limited Warranty and Support Plus Programs is not a public

safety issue.  It is a monetary issue that forces the owners to pay for the maintenance and support

sooner and possibly at a higher cost, but they can still purchase that maintenance and support

from Hawker or from third-parties.

**D.**    **Judicial Estoppel**

"Judicial estoppel is designed to prevent a party who plays fast and loose with the courts

from gaining unfair advantage through the deliberate adoption of inconsistent positions in

successive suits."  *Wight v. BankAmerica Corp.*, 219 F.3d 79, 89 (2d Cir. 2000); *accord Zedner*

*v. United States*, 547 U.S. 489, 504 (2006); *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001);

*Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1037 (2d Cir. 1993).  The doctrine serves two

purposes: "to preserve the sanctity of the oath by demanding absolute truth and consistency in all

sworn positions," and to "protect judicial integrity by avoiding the risk of inconsistent results in

the two proceedings."  *Bates*, 997 F.2d at 1037-38.

The application of judicial estoppel is discretionary, and three factors generally inform

the court's discretion.  First, the party's position must be "'clearly inconsistent' with its earlier

position"; second, the party must have "succeeded in persuading a court to accept that party's

earlier position"; and third, "the party seeking to assert an inconsistent position would derive an

unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *New*

*Hampshire v. Maine*, 532 U.S. at 750-51; *accord Zedner*, 547 U.S. at 504; *see Uzdavines v.*

*Weeks Marine, Inc.*, 418 F.3d 138, 148 (2d Cir. 2005).  The Second Circuit has taken a fairly

narrow view of the doctrine, stating that judicial estoppel is limited "to situations where the risk

of inconsistent results with its impact on judicial integrity is certain."  *Uzdavines*, 418 F.3d at

148 (quoting *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2d Cir. 1997)).

Some of the objecting parties argued that Hawker is attempting to take a position on the *Rejection Motion* inconsistent with the one it successfully took on the *Motion to Honor*.  For example, McGrath pointed to Hawker's earlier statements that the warranty and support obligations did not require significant cash expenditures in most instances, were critical to maintaining certain aspects of Hawker's revenue and ongoing viability and were necessary to assure its customers and potential future customers that its reorganization would cause minimal disruptions to its operations.  (*McGrath Objection* at ¶ 18.)  According to Pace, Hawker previously argued that "performance of their warranty obligations were critical to the restructuring of the Debtors and to future sales."  (*Pace Objection* at ¶ 20.)  McGrath and Pace have withdrawn their objections, but before then, RCS joined in and adopted those objections as its own.  (*RCS Objection* at 3.)

Hawker's position at the time of the *Motion to Honor* is not "clearly inconsistent" with its current position on the *Rejection Motion*, and will not lead to an inconsistent result.  Hawker's earlier statements were made when it was still possible that Hawker might sell or continue some or all of its jet product lines and honor associated warranty and support obligations.  As a result, Hawker decided at that time that it was important to maintain the loyalty of its jet customer base, and to continue on a discretionary basis to honor the Customer Programs pertaining to the Hawker 4000 and Premier aircraft.  Nevertheless, Hawker did not unconditionally commit itself.  The *Motion to Honor* and resulting orders authorized but did not direct Hawker to honor any of the Customer Programs, left the decision to its sole discretion, did not assume any executory contracts and reserved all of Hawker's rights.

Hawker eventually found itself left with only one option.  It proposed a plan under which it will terminate the production of all or substantially all of its jet product lines, including the

Hawker 4000 and Premier aircraft.  Although Hawker understandably feels an obligation to continue to support all of its former customers, it decided to reject the Hawker 4000 and Premier warranty and support obligations based upon its decision to stop producing these aircraft, the substantial cost to Hawker of honoring the obligations and the implicit conclusion that any possible spillover effect on its other business did not justify a different outcome.  The two positions are not inconsistent; rather they reflect changed circumstances and different considerations that necessarily informed Hawker's business judgment at different times.

The evidence also fails to disclose that Hawker gained an unfair advantage or imposed an unfair detriment on the Hawker 4000 and Premier buyers that hold rights under a Limited Warranty or Support Plus Program.  Hawker's early decision to honor these warranty and support obligations resulted in a cost to Hawker without a corresponding material benefit.  To the extent Hawker provided warranty or support services post-petition under pre-petition agreements that it did not assume, the beneficiaries obtained an advantage by receiving a "distribution" on their unsecured contract claims.  Furthermore, even if the results of the *Motion to Honor* induced someone to buy a Hawker 4000 or Premier jet, Hawker cannot reject a post-petition Aircraft Purchase Agreement or Support Plus Agreement anyway.  Accordingly, I conclude that Hawker is not judicially estopped in taking its current position.

## E.    Unfair Discrimination

RCS charged Hawker with discriminating against similarly-situated holders of warranty and support rights by rejecting some but not all of its warranty obligations.  Instead, Hawker "could ratably reduce warranty benefits to all plane models in order to avoid preferring certain model owners over others."  (*RCS Objection* at 3.)

This argument is frivolous.  No principle of bankruptcy law requires a debtor to assume or reject all of its similar contracts.  Furthermore, RCS's reference to the "confirmation requirements that similarly situated creditors receive similar treatment," (*id.*), is misguided.  The requirement contained in 11 U.S.C. § 1123(a)(4) that the plan provide the same treatment to each claim in a particular class, unless the holder of the claim agrees to less favorable treatment, simply means that RCS, as a member of the unsecured class, will receive the same distribution as the other members of its class, unless it agrees to take something less.  The requirement under 11 U.S.C. § 1129(b) that the plan cannot unfairly discriminate against a rejecting class only applies in a cram down, and requires the court to compare the rights granted *under the plan* to similar classes, at least one of which has rejected the plan.  The *Rejection Motion* is not governed by sections 1123(a)(4) or 1129(b) (or section 547 which RCS also cites), and these provisions do not require Hawker to assume all of its warranty and support obligations or spread the hurt ratably among similarly-situated non-debtor contract parties.

## F.    The Rotorwing Objection

### 1.    Background

On or around November 12, 2009, Lider International Aviation, B.V. ("Lider") entered into an agreement with Hawker to buy a used Premier aircraft for $3,900,000.  (*See Rotorwing Objection* at ¶ 4; *Resale Aircraft Purchase Agreement* ("*Resale Agreement*").)[14]  The *Resale Agreement* incorporated several documents by reference, including *General Terms and Conditions* ("*General Terms*"), a warranty (the "Lider Warranty"), and an *Addendum to Resale Agreement* ("*Addendum*").  The Lider Warranty provided that from the date of the original retail

---

[14]    The *Resale Agreement* is attached as Exhibit A to the *Rotorwing Objection*.  The other contract documents discussed in this section are attached either as exhibits to the *Resale Agreement* or as a separate Exhibit B to the *Rotorwing Objection*.

sale—March 4, 2008—Hawker warranted the factory manufactured parts and supplier systems and components for five years, Collins Avionics for five years, Williams-Rolls Engines for three years or 1,500 hours from first use, whichever occurred first, and exterior paint and interior finish items for two years.  The *General Terms* also imposed several obligations on the buyer which are discussed below.

The parties consummated the sale on November 30, 2009, at which time Hawker transferred title to the aircraft and Lider paid the balance of the purchase price.  (*Rotorwing Objection* at ¶ 5.)  On August 26, 2010, Lider sold the aircraft to Helicoptor Finance, LLC, and on the same day, the latter leased the aircraft to Rotorwing with an option to purchase it.  (*Id.* at ¶¶ 6-7.)

### 2.    Rotorwing's Objection

Rotorwing raised three objections to the *Rejection Motion*: (1) the Court lacks personal jurisdiction over Rotorwing because it was not properly served, (2) the *Resale Agreement*, which includes the Lider Warranty that Hawker seeks to reject, is not executory, and (3) the doctrine of judicial estoppel bars Hawker from rejecting its Customer Programs for Hawker 4000 and Premier aircraft.  The Court has already overruled the last point and proceeds to the other two.

### a. Sufficiency of Service

Rotorwing is an entity located in the Netherlands.  According to Hawker's affidavit of service, it served the *Rejection Motion* on Rotorwing by addressing it to the attention of the "president or legal department," and enclosing it "securely in [a] separate postage pre-paid envelop[e] and delivered via overnight mail."  (*Affidavit of Service*, sworn to Nov. 27, 2012 (ECF Doc. # 833).)

Bankruptcy Rule 6006 governs the procedure for assuming or rejecting an executory

contract.  It makes Bankruptcy Rule 9014 applicable, FED. R. BANKR. P. 6006(a), and the

*Rejection Motion* must, therefore, be served in the manner provided for the service of the

summons and complaint under Bankruptcy Rule 7004.  *See* FED. R. BANKR. P. 9014(b).

Bankruptcy Rule 7004(b)(3) authorizes service on a corporation by first class mail, but is limited

to mailing within the United States.  However, Bankruptcy Rule 7004(a) incorporates the

provisions of rules 4(f) and 4(h) of the Federal Rules of Civil Procedure ("Federal Civil Rules"),

which govern service in a foreign country.

Federal Civil Rule 4(f), which governs service on an individual in a foreign country,

provides:

> Unless federal law provides otherwise, an individual—other than a minor, an
> incompetent person, or a person whose waiver has been filed—may be served at a
> place not within any judicial district of the United States:
>
>> (1) by any internationally agreed means of service that is reasonably calculated
>> to give notice, such as those authorized by the Hague Convention on the
>> Service Abroad of Judicial and Extrajudicial Documents;
>>
>> (2) if there is no internationally agreed means, or if an international agreement
>> allows but does not specify other means, by a method that is reasonably
>> calculated to give notice:
>>
>>> (A) as prescribed by the foreign country's law for service in that country
>>> in an action in its courts of general jurisdiction;
>>>
>>> (B) as the foreign authority directs in response to a letter rogatory or letter
>>> of request; or
>>>
>>> (C) unless prohibited by the foreign country's law, by:
>>>
>>>> (i) delivering a copy of the summons and of the complaint to the
>>>> individual personally; or
>>>>
>>>> (ii) using any form of mail that the clerk addresses and sends to the
>>>> individual and that requires a signed receipt; or
>>
>> (3) by other means not prohibited by international agreement, as the court
>> orders.

Federal Civil Rule 4(h), which governs service on a corporation, states in relevant part that "[u]nless federal law provides otherwise . . . a domestic or foreign corporation . . . must be served . . . (2) at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)." Thus, with the exception of personal delivery, Rule 4(h) incorporates Rule 4(f) and permits service in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention"). Rotorwing was served in the Netherlands, and the Netherlands is a party to the Hague Convention. *See Tinsley v. ING Grp.*, No. Civ.A. 05-808-KAJ, 2006 WL 533375, at *1 (D.Del. Mar. 3, 2006).

Article 10(a) of the Hague Convention states that "[p]rovided the State of destination does not object, the present Convention shall not interfere with - (a) the freedom to send judicial documents, by postal channels, directly to persons abroad." The Netherlands has not objected to sending judicial documents by "postal channels," *Tinsley*, 2006 WL 533375, at *1, and consequently, service of process through a "postal channel" on a corporation in the Netherlands is permissible, even if it does not comply with the requirements of Federal Civil Rule 4. *See Ackermann v. Levine*, 788 F.2d 830, 840-41 (2d Cir. 1986).

Although this conclusion appears to dispose of Rotorwing's objection to service, a question remains. The affidavit of service does not indicate that Hawker sent the *Rejection Motion* using the United States Postal Service or that it was routed to Rotorwing by an equivalent organization in the Netherlands. I infer that Hawker used a private overnight international mail courier service such as Federal Express. The question is whether a private courier is a "postal channel" within the meaning of Article 10(a).

28

"Postal channels" is not defined in Article 10(a).  Richard J. Hawkins, *Dysfunctional Equivalence: The New Approach to Defining "Postal Channels" Under the Hague Service Convention*, 55 UCLA L. Rev. 205, 223 (2007).  Nevertheless,

> In 2006, the Permanent Bureau of the Hague Conference on Private International Law (Permanent Bureau), the intergovernmental organization that acts as the Convention's secretariat, took a position that transmission of documents via postal channels can include transmission by modern commercial and technological means, provided that transmission through these alternative means constitutes the "functional equivalent" of a postal channel.

*Id.* at 207-08.

The use of a courier service is the functional equivalent of sending the *Rejection Motion* through the United States Post Office.  Here, Rotorwing received what Hawker sent.  Moreover, some courts have concluded that service by private international courier satisfies Article 10(a) provided that the receiving nation has not objected.  *R. Griggs Grp. Ltd. v. Filanto Spa*, 920 F. Supp. 1100 (D.Nev. 1996) (upholding service by Federal Express under Article 10(a) of the Hague Convention); *Power Integrations, Inc. v. Sys. Gen. Corp.*, No. C 04-02581 JSW, 2004 WL 2806168, at *2 n.3 (N.D. Cal. Dec. 7, 2004) (stating that *Griggs* found that Federal Express was a "postal channel" for purposes of the Hague Convention); *cf. Kelley v. Cinar Corp. (In re Cinar Corp. Sec. Litig.)*, 186 F. Supp. 2d 279, 303-04 (E.D.N.Y. 2002) (questioning but not deciding whether Purolator Courier is a postal channel within the meaning of Article 10(a) of the Hague Convention).  In addition, the use of an international courier service is consistent with due process, *see Dee-K Enter., Inc. v. Heveafil Sdn. Bhd.*, 174 F.R.D. 376, 381-82 (E.D.Va. 1997) (upholding service of process by DHL courier in Indonesia and Malaysia), and Rotorwing has not suggested otherwise.  Accordingly, the Court concludes that service by overnight international courier on Rotorwing complies with Article 10(a) of the Hague Convention and the

29

requirements of due process under the law of the United States, and Rotorwing's objection based on the sufficiency of service is overruled.

*In re Teknek, LLC*, 512 F.3d 342 (7th Cir. 2007), on which Rotorwing relies, is distinguishable. There, a creditor commenced a contested matter moving to hold Hamilton in contempt. Hamilton lived in Scotland, and instead of serving Hamilton where she lived, the creditor mailed a copy of the motion to Hamilton's lawyer in Chicago. The Court of Appeals stated that under the Hague Convention, service by mail is not allowed, and suggested that Hamilton had to be served personally in Scotland. *Id.* at 345-46.

While the Court of Appeals correctly concluded that service on Hamilton's attorney in Chicago was insufficient under Bankruptcy Rules 9014(b) and 7004, its statement that service by mail under the Hague Convention is never permissible conflicts with the Second Circuit's ruling in *Ackermann*. To the contrary, service by mail on a corporation is permissible under the Hague Convention where, as in the case of the Netherlands, the nation in which service is made does not object to the use of "postal channels." [15]

### b.    Executoriness

The principles governing the question of executoriness are set out above. The *Resale Agreement* did not incorporate the broader Limited Warranty contained in the Premier Aircraft

---

[15] International service by courier or even by first class mail is arguably insufficient under the internal law of the Netherlands. *See Tinsley*, 2006 WL 533375, at *1 (noting that in the Netherlands, "[s]ervice of process by international registered mail is permitted under Dutch law in administrative, civil and criminal cases" (quoting *The Netherlands Judicial Assistance*, *available at* http:// travel.state.gov/law/info/judicial). However, the focus is on the requirements of service in federal court under the Hague Convention—an international treaty—not the rules governing the service of process in proceedings in the Netherlands. Regarding the former, the Netherlands has never objected to service through "postal channels," and Rotorwing does not contend that service under Article 10(a) must comply with the Netherlands' own internal rules.

Purchase Agreement.  Furthermore, the Lider Warranty had largely expired by the petition date, and Hawker's only remaining obligations related to the factory manufactured parts and systems and components supplied by Collins Avionics.

The *Resale Agreement* also imposed obligations on the buyer beyond payment.  It contained a confidentiality provision that, with certain exceptions, prohibited either side from disclosing its terms to a third party without the express written approval of the other party. (*Resale Agreement*, at *General Terms*, at § IV, ¶ 10.)  The buyer also agreed that would not register or allow any registration against the aircraft pursuant to the Cape Town Treaty as defined in the *General Terms* without the seller's written authorization.  (*Id.* at § IV, ¶ 11.)  In the event the buyer intended to export the aircraft, it promised to comply with all United States export laws and indemnify the seller for any consequences arising from the failure to comply with those laws.  (*Id.* at § IV, ¶ 12.)  The parties agreed that any work needed to meet the requirements for obtaining an export certificate of airworthiness, aircraft registration or airworthiness certification from any aviation authority other than the United States Federal Aviation Administration would be borne by the buyer, and the buyer agreed to indemnify the seller for any such costs.  (*Id.* at § IV, ¶ 15.)  Finally, the buyer agreed to indemnify the seller and others from any liability, except for willful misconduct or gross negligence, arising directly or indirectly out of or in connection with the aircraft familiarization and training program provided under the *Resale Agreement*.  (*Resale Agreement*, at *Addendum*, § 2(b).)

Unlike the Aircraft Purchase Agreements, the *Resale Agreement* did not include a provision that made any breach of its terms and conditions material.  Because materiality is a question of fact, the absence of such a clause precludes the Court from deciding as a matter of law that Rotorwing had material obligations remaining as of the petition date that would render

the *Resale Agreement* executory. A hearing is necessary to resolve this question, although for the reasons stated earlier, is unnecessary to free Hawker from the duty to provide warranty or support services to Rotorwing under the *Resale Agreement*. In the event that Hawker desires a hearing, it should consult with Rotorwing and contact chambers to schedule one.

## CONCLUSION

The *Rejection Motion* is granted with respect to the Aircraft Purchase Agreements and Support Plus Agreements pertaining to the Hawker 4000 and Premier aircraft. It is denied with respect to any other Customer Programs because Hawker has failed to show that the relevant agreements are executory. Finally, a hearing is necessary to decide whether the *Resale Agreement* is executory. Settle order on notice.

Dated: New York, New York
       January 28, 2013

                              /s/ *Stuart M. Bernstein*
                               STUART M. BERNSTEIN
                              United States Bankruptcy Court