UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re:                                                          :
                                                                :
HAWKER BEECHCRAFT, INC., *et al.*,              :          Chapter 11
                                                                :          Case No.: 12-11873 (SMB)
                              Reorganized Debtors.    :          Jointly administered
------------------------------------------------------------------X

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

> James H.M. Sprayregen, Esq.
> Paul M. Basta, Esq.
> Patrick J. Nash, Jr., Esq.
> Ross M. Kwasteniet, Esq.
> Scott A. McMillin, Esq.
> Of Counsel

*Attorneys for Reorganized Debtors*


HALPERIN BATTAGLIA RAICHT, LLP
40 Wall Street, 37th Floor
New York, New York 10005

> Jocelyn Keynes Szekretar, Esq.
> Of Counsel

 -and-

HALL, ESTILL, HARDWICK, GABLE, GOLDEN & NELSON, P.C.
320 South Boston Avenue, Suite 200
Tulsa, OK  74103-3706

> Steven W. Soulé, Esq.
> Of Counsel

*Attorneys for NORDAM Group, Inc.*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Raytheon Aircraft Company ("RAC"), the predecessor of the Debtor Hawker Beechcraft

Corporation (hereinafter "RAC," "Hawker" or the "Debtor")  and the NORDAM Group, Inc

("NORDAM") are parties to prepetition master agreements that allow Hawker to issue purchase

orders that NORDAM must fill.  Pursuant to its confirmed plan, Hawker assumed the master

agreements and some of the outstanding purchase orders but rejected the majority of the

outstanding purchase orders.  NORDAM objected arguing that Hawker cannot assume the

master agreements and some of the purchase orders without also assuming *all* of the purchase

orders.

The Court conducted a one day trial at which it heard the testimony of four witnesses and

received the relevant agreements and other documents into evidence.  For the reasons that

follow, NORDAM's objection is overruled.

## BACKGROUND

### A.    The Parties' Agreements

At all relevant times, the Debtors have manufactured business, special mission and

trainer/attack aircraft and have an extensive global network of more than 100 service centers

supporting an estimated fleet of more than 34,000 manufactured aircraft.  (*Statement of

Undisputed Facts Pursuant to the Stipulation and Agreed Order Regarding the Limited

Objection of the NORDAM Group, Inc. to the Debtors' Amended Joint Plan of Reorganization

Pursuant to Chapter 11 of the Bankruptcy Code with Brief in Support*, dated Apr. 4, 2013

("*Undisputed Facts*"), at ¶ 1 (ECF Doc. # 1473).)  NORDAM designs, develops, manufactures,

repairs and overhauls aircraft, bonded-honeycomb and composite components, radomes

(protective enclosures that house radar equipment), fan/thrust reversers, nacelles engine

2

components, interiors and aircraft transparencies for general, civilian, and military aircraft. (*Id.* at ¶ 2.) NORDAM also manufactures and supplies sidewalls, side panels, ducts, glare shields, covers, panels, and escutcheons, among many other interiors parts (in excess of 3,000 parts), for many of the Debtors' civil and/or military aircraft. In addition, NORDAM manufactures radomes for the Debtors, and designs, manufactures and provides to the Debtors aftermarket support for nacelles for multiple aircraft models and aftermarket and/or production support for thrust reversers and thrust reverser kits for multiple aircraft models. (*Id.* at ¶ 3.)

NORDAM and the Debtors have been commercial counterparties since the mid-1990s. (*Id.* at ¶ 4.) Prior to July 25, 2003, the Debtors manufactured the plastic and radome components designed by NORDAM for their aircraft. Through a series of agreements entered into on that date, RAC outsourced the manufacture of these components to NORDAM. First, the parties entered into two asset purchase agreements, the Asset Purchase Agreement (Radomes) ("Radomes APA") and the Asset Purchase Agreement (Plastics) ("Plastics APA" and together with the Radomes APA, the "APAs").[1] (*Id.* at ¶ 5.) Under the APAs, RAC sold NORDAM the tooling needed to manufacture the components. In exchange, NORDAM paid $200,000 in cash and delivered a $6.3 million nonrecourse note (the "Note") for the plastics tooling, (Plastics APA, at § 2.4; NORDAM Ex. 4 at 77-82), and a $1 million nonrecourse note for the radomes tooling. (Radomes APA, at § 2.4; NORDAM Ex. 5 at 29-34.) RAC retained a security interest in the tooling as collateral for the notes.

Second, the parties entered into two purchase and support agreements, the Master Purchase and Support Agreement, as amended (the "Master Plastics Agreement"), (*Undisputed*

---

[1]      The Plastics APA and the Radomes APA were received in evidence, respectively, as NORDAM Exhibits 4 and 5.

*Facts* at ¶ 6),[2] and the Master Purchase and Support Agreement, as amended (the "Master

Radome Agreement" and together with Master Plastics Agreement, the "Master Agreements").[3]

(*Id.* at ¶ 7.)  Pursuant to the Master Agreements, NORDAM agreed to manufacture and deliver

the components ordered by RAC under separate purchase orders issued by RAC that

incorporated the general terms and conditions in the Master Agreements.

Importantly, the Master Agreements did not require RAC to purchase anything.  Section

1.1 of each Master Agreement stated:

> The purpose of this MP&SA is to set forth the general terms and conditions which
> shall be incorporated into any Purchase Orders issued by RAC for the Items.  *This
> MP&SA does not authorize or obligate RAC to purchase nor does this MP&SA
> obligate RAC for any costs incurred by Supplier.  Such authority shall be
> evidenced by separate purchase orders or releases which will be issued by RAC
> from time to time as requirements are established.*  Delivery dates and quantities
> will be provided on each order/release.  RAC's determination as to what its actual
> requirements for the Goods are *and whether to purchase such requirements from
> Supplier or a third party, shall be made by RAC in its sole and uncontrolled
> discretion without liability to Supplier.*

(Emphasis added.)  The Master Plastics Agreement is discussed in greater detail below.

**B      The Bankruptcy**

Debtors filed these chapter 11 cases on May 3, 2012, and confirmed the *Debtors'

Amended Joint Plan of Reorganization Pursuant to Chapter 11of the Bankruptcy Code*, dated

Dec. 10, 2012 ("*Plan*") (ECF Doc. # 913) on February 1, 2013.  (*See Findings of Fact,

Conclusions of Law, and Order Confirming the Debtors' Amended Joint Plan of Reorganization

Pursuant to Chapter 11 of the Bankruptcy Code*, dated Feb. 1, 2013 ("*Confirmation Order*")

(ECF Doc. # 1277).)  Through the *Plan*, the Debtors' executed, among other things, their

---

[2]       The Master Plastics Agreement was received in evidence as NORDAM Exhibit 2.

[3]       The Master Agreement Radomes was received in evidence as NORDAM Exhibit 3.

4

strategy of exiting the business of manufacturing, selling and servicing jet aircraft.  Prior to

confirmation, the Debtors filed a series of Plan Supplements which, *inter alia*, identified the

executory contracts that the Debtors planned to assume or reject at the time of confirmation.

According to the Plan Supplements, the Debtors sought to assume the Master Agreements and

395 Purchase Orders while rejecting another 928 Purchase Orders.  (*See Limited Objection of the*

*NORDAM Group, Inc. to the Debtors' Amended Joint Plan of Reorganization Pursuant to*

*Chapter 11 of the Bankruptcy Code with Brief in Support*, dated Jan. 22, 2013 (ECF Doc. #

1153); *The NORDAM Group, Inc.'s Post-Hearing Proposed Findings of Fact and Proposed*

*Conclusions of Law*, dated Apr. 29, 2013, ("*NORDAM Proposed Findings & Conclusions*") at 1

(ECF Doc. # 1505).)  The rejected Purchase Orders related to parts for the discontinued jet

aircraft lines.

        As noted, NORDAM objected contending that the Master Agreements and all of the

Purchase Orders constituted a single, indivisible contract that had to be assumed or rejected *in*

*toto*.  The Debtors maintain that each Purchase Order is a separate contract that can be assumed

or rejected without regard to any other Purchase Order or the Master Agreements.  The parties

subsequently agreed that the confirmation could proceed, and the dispute relating to the

assumption of some but not all of the Purchase Orders would be decided following an

evidentiary hearing at a later date.  (*See Stipulation and Agreed Order Regarding the Limited*

*Objection of the NORDAM Group, Inc., to the Debtors' Amended Joint Plan of Reorganization*

*Pursuant to Chapter 11 of the Bankruptcy Code with Brief in Support [Docket No. 1153]*, dated

Jan. 31, 2013 (ECF Doc. # 1240).)

# DISCUSSION

## A.    Introduction

Section 365(a) of the Bankruptcy Code states that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  A debtor may not assume parts of a single, indivisible agreement while rejecting other parts.  It must assume or reject and indivisible agreement *in toto*.  *In re Teligent, Inc.*, 268 B.R. 723, 728 (Bankr. S.D.N.Y. 2001).  State law governs the question whether an agreement is divisible or indivisible for the purposes of assumption and rejection under Bankruptcy Code § 365.  *See, e.g.*, *Empire State Bldg. Co. v. New York Skyline, Inc. (In re New York Skyline, Inc.)*, 432 B.R. 66, 77 (Bankr. S.D.N.Y. 2010); *In re Buffets Holdings, Inc.*, 387 B.R. 115, 120 (Bankr. D. Del. 2008); *In re Adelphia Bus. Solutions, Inc.,* 322 B.R. 51, 55 (Bankr. S.D.N.Y. 2005); *Teligent*, 268 B.R. at 728.  The Master Agreements are governed by the law of the state of Kansas.  (*See* Master Plastics Agreement, at § 34.1; Master Radomes Agreements, at § 34.1.)  Accordingly, Kansas law determines whether the Master Agreements and the Purchase Orders issued pursuant to the Master Agreements are separate or indivisible.

Under Kansas law "[w]hether or not a contract is entire or divisible is a question of construction to be determined by the court according to the intention of the contracting parties as ascertained from the contract itself and upon a consideration of all the circumstances surrounding the making of it."  *Blakesley v. Johnson*, 608 P.2d 908, 913 (Kan. 1980); *accord In re Dickinson Theatres, Inc.*, No. 12-22602 (DLS), 2012 WL 4867220, at *2 (Bankr. D. Kan. Oct. 12, 2012); *Ary Jewelers, L.L.C. v. Krigel*, 85 P.3d 1151, 1159 (Kan. 2004).  "The primary rule for interpreting written contracts is to ascertain the parties' intent.  If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without

6

applying rules of construction." *Osterhaus v. Toth*, 249 P.3d 888, 896 (Kan. 2011); *accord*

*Dickinson Theatres,* 2012 WL 4867220, at \*2; *Kincaid v. Dess*, 298 P.3d 358, 364 (Kan. Ct.

App. 2013).

      "'A contract is divisible where by its terms, 1, performance of each party is divided into

two or more parts, and, 2, the number of parts due from each party is the same, and, 3, the

performance of each part by one party is the agreed exchange for a corresponding party by the

party.'" *Sykes v. Perry*, 176 P.2d 579, 583 (Kan. 1947) (quoting RESTATEMENT (FIRST) OF

CONTRACTS § 266(3), cmt. e); *accord Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1098

(2d Cir. 1992) ("Generally, a contract will not be regarded as severable unless (1) the parties'

performances can be apportioned into corresponding pairs of partial performances, and (2) the

parts of each pair can be treated as agreed equivalents." (citing RESTATEMENT (SECOND) OF

CONTRACTS § 240)); *First Savs. & Loan Ass'n v. Am. Home Assurance Co.*, 277 N.E.2d 638

(N.Y. 1971); JOSEPH M. PERILLO, CALAMARI & PERILLO ON CONTRACTS 11.23, at 389 (6th ed.

2009) ("CALAMARI & PERILLO").  Conversely, "a contract is entire when by its terms, nature, and

purpose, it contemplates and intends that each and all of its parts and the consideration therefor

shall be common each to the other and interdependent." *First Savs. & Loan Ass'n*, 277 N.E.2d at

639; *accord* CALAMARI & PERILLO § 11.23, at 389 n.3 ("[A] contract is entire when its terms,

nature and purposes each and all of the parts appear to be interdependent and common to one

another and to the consideration.").

      A contract may be divisible for some purposes but not others, and in determining the

question, the trier of fact must consider the purposes for which the contract is divisible.  *See*

CALAMARI & PERILLO § 11.23, at 389.  The contract rarely expresses the parties' intention on the

issue of divisibility, and the test is "whether, had the parties thought about it as fair and

reasonable persons, they would be willing to exchange the performance in question irrespective

of what happened afterwards or whether the divisions made were merely for the purpose of

requiring periodic payments as the work progresses." *Id.* at § 11.23, at 390.

The issue presented by the current dispute is whether the Debtors can assume the Master

Agreements and some but not all of the outstanding Purchase Orders while rejecting the balance

of the Purchase Orders.  The parties agree that the relevant language in the Master Plastics

Agreement and the Master Radomes Agreement are identical.  (Transcript of hearing held Apr.

11, 2013 ("Tr.") at 46 (ECF Doc. # 1497).)  Accordingly, the Court will focus on the Master

Plastics Agreement, but its conclusion applies equally to the Master Radomes Agreement.

**B.        The Nature of the Master Plastics Agreement**

It is beyond cavil that the Purchase Orders that are the subject of the Debtors' application

were issued pursuant to the Master Plastics Agreement and incorporated its terms.  Each side has

devoted a fair amount of argument to the type of agreement reflected by the Master Plastics

Agreement.  The Debtors view it as an option agreement or an open ended offer.  In particular,

they emphasize that they were not obligated to purchase anything from NORDAM.  NORDAM

argues that the Master Plastics Agreement is a requirements contract, or an installment

agreement, that imposed an implied obligation on Hawker to buy its requirements from

NORDAM.

The Master Plastics Agreement is clearly not a requirements contract.  "As Professor

Farnsworth's definition indicates, a 'requirements contract,' in order to be valid, must (1)

obligate the buyer to buy goods, (2) obligate the buyer to buy the goods exclusively from the

seller, and (3) obligate the buyer to buy all goods of a particular kind from the seller."  1 JAMES J

WHITE, ROBERT S. SUMMERS & ROBERT A. HILLMAN, UNIFORM COMMERCIAL CODE § 4:20, at

331 (6th ed. 2012) ("WHITE & SUMMERS"); *accord* CALAMARI & PERILLO § 4.13, at 188 ("In a

typical *requirements* contract, the buyer expressly agrees to buy all of the buyer's requirements

of a stated good from the seller who agrees to sell that amount to the buyer.").  "Where, however,

the agreement states no obligation to purchase any quantity, parole evidence cannot be used to

supply the missing term in order to establish an enforceable requirements contract."  1 WHITE &

SUMMERS at § 4:20, at 332-33.

    The Master Plastics Agreement fails to satisfy any of Professor Farnsworth's criteria.

Section 1.1 states unambiguously that the Master Plastics Agreement did not obligate Hawker to

make any purchases from NORDAM or deal with NORDAM exclusively, and left these

decisions entirely to Hawker's sole, unfettered discretion.  Accordingly, it is not a requirements

contract, and NORDAM could not prove through parole evidence that Hawker made an implied

promise to purchase all of its requirements from NORDAM where the Master Plastics

Agreement expressly provided the contrary.

    For the same reason, the Master Plastics Agreement is not an installment contract.  "An

'installment contract' is one which requires or authorizes the delivery of goods in separate lots to

be separately accepted, even though the contract contains a clause 'each delivery is a separate

contract' or its equivalent."  KAN. STAT. ANN. § 84-2-612(1) (2012).  Here, Hawker did not agree

to buy or take delivery of anything, and you cannot have an installment contract unless you have

a contract to purchase.  NORDAM's principal authority on this point, *Sencon Sys., Inc. v. W.R.

Bonsal Co.*, No. 85 C 8250 (WTH), 1986 WL 10989 (N.D. Ill. Sept. 29, 1986), is distinguishable

for this reason.  There, the court found an underlying requirements contract, and had to

determine "whether the series of orders and deliveries under the Sales Agreement constitutes

performance of the 'same contract' under § 2–717 of the UCC,[4] or performance of a number of separate, divisible contracts between the parties." *Id.* at *1. In this case, the Master Plastics Agreement is not an installment contract because it did not impose an obligation to purchase.

Instead, the Master Plastics Agreement, or at least that portion dealing with the purchase and sale of goods, is an option contract. "[T]he very essence of an option contract [is] that one party has the choice of concluding or not concluding a proposed transaction while the other party has no choice. It is the right of such choice for which a party receiving an option pays." *Connell v. Kanwa Oil, Inc.*, 194 P.2d 950, 952 (Kan. 1948); *accord R. J. B. Steele v. C. E. Eagle*, 483 P.2d 1063, 1066 (Kan. 1971) (stating that a true option existed when the "defendant had the choice of buying the property at the agreed price during the period September 13-October 30, while plaintiffs had no choice but to sell if the option were exercised. The right of choice is the thing for which a party receiving the option pays, or promises to pay, while the consideration furnished by the party giving the option is his lack of choice in the matter.").

NORDAM granted the option as part of the same transaction in which it bought RAC's plastics tooling,[5] and NORDAM therefore received the tooling as consideration for the option.[6]

---

[4]        Uniform Commercial Code § 2-717 states:

>        The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.

This provision is incorporated into the version of the Uniform Commercial Code adopted in Kansas as KAN. STAT. ANN. § 84-2-717. *See GFSI, Inc. v. J-Loong Trading, Ltd.*, Civ. Action No. 05-2302-KHV, 2006 WL 3523782, at *3 (D. Kan. Dec. 6, 2006).

[5]        According to the Plastics APA, "Transaction Agreements" referred collectively to the Plastics APA, the Note, the Bill of Sale, the Security Agreement, the Master Plastics Agreement and any "other agreements" entered into in furtherance of sections 2.5 and 2.6 of the Plastics APA. (Plastics APA, at 4.)

[6]        NORDAM also paid cash as part of the same overall transaction, but that does not undercut the conclusion that it received consideration for entering into the Master Plastics Agreement.

Furthermore, although the Master Plastics Agreement did not legally require RAC to buy parts

from NORDAM, NORDAM fully expected RAC to do so.  NORDAM had initially opposed

section 1.1, and insisted on a sole source contract.  It eventually dropped its demand because it

anticipated that RAC would have to buy all of its parts from NORDAM anyway.  As Ronald

Richman, then-president of NORDAM's manufacturing division and the person who negotiated

and executed the Master Plastics Agreement on NORDAM'S behalf, testified:

> There was—as part of a multitude of negotiations at that time, we would have
> conceded specifically on this sentence because we were acquiring all of the things
> necessary to purchase the parts.  It was improbable that RAC could go anywhere
> else and get the exact parts, economically, within the appropriate lead time.
> Therefore, if you tie that to the promissory note that says the only way they get
> paid for the tooling is to buy parts from me, so if I control the tooling and the
> intellectual property, the equipment and the method for repaying the purchase of
> the assets, those things in turn along with a hand shake was the—did not require
> that it be a sole-source contract, in my opinion at that time.

(Tr. at 76.)

RAC exercised the option and accepted NORDAM's open offer each time it issued a

Purchase Order, which section 1.1 of the Master Plastics Agreement recognized as the

authorizing, or binding, document.  The Purchase Order would include a part number, quantity

and delivery date; the prices for the parts were covered in the Master Plastics Agreement.  (Tr. at

121-22.)  The Master Plastics Agreement contained inconsistent provisions regarding whether

NORDAM could refuse to accept a Purchase Order.  Under section 8.3, NORDAM was required

to "accept Purchase Orders issued by RAC for any quantity of Goods [7] for so long as RAC

manufactures, sells or supports the Aircraft."  However, section 4.3 stated that NORDAM was

---

[7]        "Goods" meant "any parts or material delivered hereunder whether or not they are destined to be
incorporated on the Aircraft including, without limitation, Components, LRU's, Items, Systems, Spare Parts and
Special Ground Support Equipment.  (Master Plastics Agreement, at § 2.1.13.)

required to acknowledge each Purchase Order and/or Release[8] within ten days, and indicate its

acceptance or rejection of the Purchase Order.  The latter provision suggested that it could reject

a Purchase Order.  In practice, NORDAM never rejected a Purchase Order, (Tr. at 131, 141), and

section 4.3 was apparently limited to situations where the Purchase Order requested a delivery

date, an engineering specification or a part that did not conform to the terms of the Master

Plastics Agreement.  (*See* Tr. at 51, 130, 138, 142.)

The conclusion that the Master Plastics Agreement granted an open-ended option to

purchase does not mean that it was not also an executory contract for the purpose of assumption

under Bankruptcy Code § 365.  The Master Plastics Agreement imposed material obligations on

RAC as well as NORDAM which were executory on the petition date.  Both parties were

required to protect and treat as confidential all "Proprietary Information" in connection with the

Master Plastics Agreement or the Purchase Orders issued thereunder.  (Master Plastics

Agreement, at §§ 23.1, 23.2.)  By the time of the petition date, the parties had fulfilled many

Purchase Orders.  Following termination or cancellation of the Master Plastics Agreement, the

parties had to promptly return the originals of the Proprietary Information received by the other.

(*Id.* at § 23.3.)  Neither party could use the other's name or products or any information related

to the Master Plastics Agreement or related documents for publicity purposes without the other

party's written consent.  (*Id.* at § 24.1.)  Finally, RAC was obligated to meet with NORDAM and

obtain its concurrence to certain portions of RAC's various manuals.  (*Id.* at § 8.12.)

---

[8]     "Release" meant "the document issued pursuant to this MP&SA by RAC, which commits RAC to purchase
Goods pursuant to the specific Goods production schedules listed on the Release."  (Master Plastics Agreement, at §
2.1.33.)  "Purchase Order" was defined as "the document issued pursuant to this MP&SA by RAC setting forth
which Products RAC intends to order at a future date, or amending a prior Purchase Order."  (*Id.* at § 2.1.30.)  The
parties used the terms interchangeably.

**C.     The Divisibility or Indivisibility of the Master Plastics Agreement and the Purchase Orders.**

**1.     The Plastics APA**

The Plastics APA indicated that the Purchase Orders were separate from the Master Plastics Agreement.  As noted, the Plastics APA, Master Plastics Agreement the Note and Security Agreement were executed simultaneously.  The Plastics APA defined the "Transaction Agreements" to mean, collectively, the Plastics APA, the Note, the Bill of Sale, the Security Agreement, the Master Plastics Agreement and any "other agreements" entered into in furtherance of sections 2.5 and 2.6 of the Asset Purchase Agreement (Plastics).  (Plastics APA, at 4.)  The definition did not include the Purchase Orders.

NORDAM argues that Purchase Orders were the "other agreements" captured by this provision, "making all purchase orders part of an indivisible contract with the Master [Plastics] Agreement."  (*NORDAM Proposed Findings & Conclusions* at ¶ 30.)  This is incorrect.  Sections 2.5 and 2.6 in the Plastics APA dealt with "other agreements" that the parties were required to deliver "[c]oncurrent[ly] with the execution of this [Plastics APA]."  (Plastics APA, §§ 2.5, 2.6.)  "Other agreements" could not, therefore, include non-existent, future Purchase Orders.  Furthermore, if the Master Plastics Agreement was a "Transaction Agreement" but the Purchase Orders were not, the Master Plastics Agreement and the Purchase Orders had to be separate agreements.

Similarly, NORDAM points to the integration clauses in the APAs (Plastics APA, at § 9.3; Radomes APA, at § 9.3), which state that "[t]he Transaction Agreements (including the Exhibits, Schedules, and other writings referred to herein and therein) constitute the entire agreement between the Parties . . . ."  (*NORDAM Proposed Findings & Conclusion* at ¶ 31.)  The

reference to "other writings" is ambiguous and NORDAM did not offer any evidence to explain

its meaning.  I reject NORDAM's interpretation that "other writings" includes Purchase Orders

which were referred to in the Master Plastics Agreement.  It conflicts with the integration clause

in the Master Plastics Agreement, discussed in the next paragraph, and did not exist at the time

of the closing.

### 2.        The Master Plastics Agreement

The provisions of the Master Plastics Agreement also show that it was intended to "set

forth the general terms and conditions which shall be incorporated into any Purchase Orders,"

(Master Plastics Agreement, at § 1.1), but remain a separate agreement.  Section 2.1.1 defined

the Master Plastics Agreement to include the agreement itself and certain specified appendices,

as well as additional appendices required to support specific programs or contracts.  "To the

extent that one, all or any combination [of additional appendices] are required, they will be

incorporated in the individual Purchase Order(s) generating the requirement and shall be

considered as part of this MP&SA."  (*Id.* at § 2.1.1.)  Notably, while the additional appendices

became part of the Master Plastics Agreement, the individual Purchase Orders that generated the

need for the additional appendices did not.  In this regard, section 2.1.1 concluded: "No other

documents shall form part of this MP&SA."  In short, the Purchase Orders issued pursuant to the

Master Plastics Agreement were not part of the Master Plastics Agreement.  Similarly, section

42.2, the integration clause, provided that the Master Plastics Agreement contained the entire

agreement of the parties, omitting any reference to the Purchase Orders.

The performance, termination and assignment provisions in the Master Plastics

Agreement provide even stronger evidence of the parties' intent to treat the Purchase Orders as

separate contracts:

1.      If any delivery under any purchase order was delayed for more than one month by reason of Force Majeure, "RAC may, upon written notice to Supplier with respect to the undelivered Goods, *either terminate any or all Purchase Orders, or terminate all or part of the MP&SA and Purchase Orders issued thereunder.*"  (Master Plastics Agreement, at § 29.3 (emphasis added).)

2.      RAC had the absolute right to "terminate the MP&SA *or any existing Purchase Order or Release* for Goods issued hereunder, either in whole or in part by providing Supplier written notice of its intent to terminate a Release."  (*Id.* at § 31.1 (emphasis added).)

3.      RAC had no recourse "if the MP&SA *or any Purchase Order or Release* is terminated due to lack of sales of the Aircraft."   (*Id.* at § 31.5 (emphasis added).)

4.      If NORDAM breached any term of the Master Plastics Agreement or any Purchase Order and failed to cure the breach, RAC could "terminate this MP&SA or any Purchase Order."  (*Id.* at § 32.1.)

5.      If the Master Plastics Agreement was terminated, any outstanding Release "which is partially or totally unfilled on the date of termination shall continue to be subject to all the terms and conditions hereof."  (*Id.* at § 37.1.)[9]

6.      NORDAM was prohibited from assigning "any rights or obligations due or to become due under this MP&SA or any Purchase Order or Release without the prior written consent of RAC."  (*Id.* at § 38.1.)

If the Purchase Orders and the Master Plastics Agreement were a single, indivisible

contract, the parties would not have made these distinctions between performing, terminating or

assigning the Master Plastics Agreement on the one hand and a Purchase Order on the other.

NORDAM points to a single provision relating to "stop Work" orders in the Master

Plastics Agreement which, it argues, undermines this conclusion.  A stop Work order is a notice

issued by Hawker asking NORDAM to hold the production of the parts covered by the

---

[9]      NORDAM contends that without the Master Plastics Agreement there can be no Purchase Order that could stand as a separate contract.  (*See NORDAM's Proposed Findings & Conclusions*, at 54-55.)  This is obviously incorrect because RAC could terminate the Master Plastics Agreement without terminating a Purchase Order.  The Master Plastics Agreement would continue to govern the outstanding Purchase Orders.  RAC could not issue new Purchase Orders, not because of any reason of indivisibility, but because the termination of the Master Plastics Agreement terminated NORDAM's offer to fill future Purchase Orders and RAC no longer had an option that it could exercise.

corresponding Purchase Orders.  (Tr. at 115.)  If Hawker issued a stop Work order that lasted for

more than twelve consecutive months, the parties were required to review the situation and

decide by mutual agreement either to extend the stop Work order for an additional period or

terminate the Master Plastics Agreement in accordance with Article 31 governing a Termination

for Convenience.  (Master Plastics Agreement, at § 4.5.)  The discontinued jet aircraft have been

under a stop Work order for more than twelve consecutive months, (Tr. at 115-16), and

NORDAM contends that Hawker's rights are limited to terminating the Master Plastics

Agreement; it cannot terminate the Purchase Orders that are the subject of the stop Work orders.

The parties did not offer evidence to explain why the Master Plastics Agreement

provided for different termination rights when a Purchase Order was under a longstanding stop

Work order, and the Court can only speculate on the reasons for the distinction.  In interpreting

section 4.5, the Court must not consider it in isolation, and instead, must construe the contract as

a whole.  *Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 241 F. Supp. 2d 1123, 1146 (D.

Kan. 2002); *Arnold v. S.J.L. of Kansas Corp.*, 822 P.2d 64, 67 (Kan. 1991) ("'The meaning of a

contract should always be ascertained by a consideration of all pertinent provisions and never be

determined by critical analysis of a single or isolated provision.'" (quoting *Garvey Ctr., Inc. v.

Food Specialties, Inc.*, 519 P.2d 646, 649 (Kan. 1974))).  Hawker had the absolute right without

cost to terminate any Purchase Order due to lack of sales of a particular aircraft.  (Master Plastics

Agreement, at § 31.5.)  Hawker no longer sells the aircraft to which the stopped Purchase Orders

relate, and could terminate the Purchase Orders under this provision.  The Master Plastics

Agreement also gave Hawker broad rights to terminate the Master Plastics Agreement, a

Purchase Order, or both, for any reason or no reason.  The Master Plastics Agreement did not say

that section 4.5 applied to the exclusion of section 31.5 or Hawker's other rights, and in practice,

16

Hawker terminated Purchase Orders subject to stop Work orders due to lack of sales.  (Tr. at 143.)  Given the rights granted to Hawker under the Master Plastics Agreement and the parties' practice, I interpret section 4.5 simply to provide an alternative to cancellation that allowed the parties to agree to place a Purchase Order on an indefinite hold.

In any event, the Debtors are not attempting to terminate the Purchase Orders, but instead, reject them, *i.e.*, breach them through non-performance.  The termination provisions provide a helpful guide to how the parties intended to deal with the analogous situation of rejection, but do not govern the Debtor's assumption and rejection rights under the Bankruptcy Code.

NORDAM makes a similar argument regarding the delivery of non-conforming goods. RAC could terminate the Master Plastics Agreement under Article 32 (Termination for Default) if NORDAM delivered non-conforming goods, RAC rejected the delivery and NORDAM failed to "expeditiously correct" it.  (Master Plastics Agreement, at § 4.4.)  NORDAM  interprets this right as "further evidence of the parties' intent to not treat purchase orders as being divisible from the Master Agreement, since the parties' own wording here refers to the MP&SA as shorthand for all of the contract's elements as an indivisible whole," (*NORDAM Proposed Findings & Conclusions* at ¶ 48), and characterizes section 4.4 as a "cross-default" provision. (*Id.* at 65.)

Cross-default provisions generally allow a party to terminate an agreement based on a default under a separate agreement, so NORDAM's characterization is self-defeating.  In any case, section 4.4 simply confirms the rights granted to RAC under Article 32, another cross-default provision, in a specific situation.  Under section 32.1, RAC could terminate the Master

Plastics Agreement or any Purchase Order if NORDAM breached any term of the Master

Plastics Agreement or a Purchase Order, and failed to cure that breach.  If RAC rejected a

delivery and returned the non-conforming goods, the rejection and return would effectively

terminate the applicable Purchase Order.  Consistent with section 32.1, section 4.4 also gave

RAC the option to terminate the Master Plastics Agreement.

Viewed in its entirety, the terms of the Master Plastics Agreement reflected that purchase

and sale obligations that arose under each Purchase Order were divisible from each other and

from the Master Plastics Agreement.  The parties' performance was divided into matching parts

corresponding to the purchase and sale obligations created by each Purchase Order.  The

payment of the purchase price was the consideration for the delivery of the part.  Thus, each

purchase and sale was an "agreed equivalent" exchange.  The exchange was independent of like

exchanges under other Purchase Orders and was not consideration for the entry into the Master

Plastics Agreement.   These factors satisfy the criteria for divisibility under Kansas law.  *See*

*Sykes*, 176 P.2d at 583.  NORDAM's contrary argument leads to an absurd result that must be

avoided.  *See Arnold*, 822 P.2d at 67; *Garvey Ctr.*, 519 P.2d at 649.  If all of the Purchase Orders

and the Master Plastics Agreement were a single indivisible contract, Hawker could not

terminate some and perform others.  It would have to perform all or perform none.  This is

directly contrary to the express provisions of the Master Plastic Agreement, and as discussed

below, the practice of the parties.

This conclusion is also supported by the cases that have considered the issuance of

purchase orders under similar agreements establishing relationships but requiring the purchase

orders to effect the contemplated future transactions.  For example, in *Carlisle Corp. v. Uresco*

*Constr. Materials, Inc.*, 823 F. Supp. 271 (M.D. Pa. 1993), decided under Pennsylvania law, the

18

parties entered into a distributorship agreement.  *Id.* at 272.  The plaintiff eventually brought an

action for price under the Uniform Commercial Code against the defendant-distributor based

upon its failure to pay certain invoices.  *Id.*  The defendant argued that it was entitled to set-off

damages it had incurred as a result of the plaintiff's breach of the distributorship agreement.  *Id.*

The defendant's set off claim implicated the question of divisibility.  As noted earlier, in

an action for price, section 2-717 of the Uniform Commercial Code permits the defendant to

"deduct all or any part of the damages resulting from any breach of the contract from any part of

the price still due *under the same contract*."  (Emphasis added.)  The question before the District

Court in *Carlisle* was "whether the 146 invoices in question are, in fact, part of the same contract

as the distributorship agreement."  *Id.* at 273.

Answering the question in the negative, the District Court concluded that each invoice

reflected a separate contract.  The distributorship agreement did not provide for any specific

shipment or payment for any goods, and instead, broadly set forth the payment terms and the

right of termination.  *Id.* at 274.  The specific prices and quantities were set forth either in

purchase orders sent by the defendant or in invoices sent by the plaintiff.  *Id.*  The distributorship

agreement did not create any right to payment; rather, it created a potential for future sales that

materialized when the defendant ordered products from the plaintiff.  At that point, each

purchase order/invoice created a right to payment.  *Id.*; *accord S.A.M. Elecs., Inc. v.

Osaraprasop*, 39 F. Supp. 2d 1074, 1086 (N.D. Ill. 1999) ("Under Illinois law, distributorship

agreements and the purchase orders arising under them are different contracts when 'the price,

type, and quantity of goods sold resulted from accepted purchase orders and not from the

distributorship agreement.'" (quoting *Schieffelin & Co. v. Valley Liquors, Inc.*, 823 F.2d 1064,

1067 (7th Cir. 1987)); *To-Am Equip. Co., Inc. v. Mitsubishi Caterpillar Forklift Am.*, 913 F.

19

Supp. 2d 1148, 1155 (N.D. Ill. 1995) (applying the same rule to a franchise agreement); *see*

*GFSI*, 2006 WL 3523782, at *3 (holding that purchase orders issued pursuant to a Requirements

Manual were separate contracts where the Requirements Manual set forth general terms but

omitted specific price and quantity terms, was not signed by the parties and contemplated that

future purchase orders would constitute the contract).

The Master Plastics Agreement is similar to the agreements in the cited cases. The

Master Plastics Agreement did not provide for any specific purchase or sale of any goods, and

instead, set forth the general provisions that would govern future Purchase Orders. Although the

Master Plastics Agreement included price terms, it did not specify any quantities or dates of

delivery. Moreover, it did not create an obligation to buy, sell or pay; it created a potential for

future sales, and the purchase and sale obligations arose only after Hawker issued a future

Purchase Order.

### 3.    The Purchase Orders

The Master Plastics Agreement recognized that the Purchase Orders might contain

additional definitions. (Master Plastics Agreement, at § 2.2.) Furthermore, each Purchase Order

included an "Instruction to Supplier" that Hawker's general terms and conditions of purchase

located on its website (the "General Terms") were incorporated into the Purchase Order as if

fully set forth in the Purchase Order. (NORDAM Ex. 10.) Under the General Terms, each

Purchase Order included its own integration clause stating that "[a]ll documents attached hereto

or referenced herein . . . including any applicable purchase or support agreements, are hereby

incorporated as an integral and inseparable part of this purchase order, which contains the entire

agreement of the parties . . . ." (NORDAM Ex. 9, at ¶ 29.) Thus, each Purchase Order was a

separate agreement that incorporated the Master Plastics Agreement, and different Purchase

Orders were not part of the parties' "entire agreement."

NORDAM contends that the parties did not intend to incorporate the General Terms in

the Purchase Orders because the terms of Master Plastics Agreement trumped the General

Terms, pointing to sections 1.1 and 42.2 (the integration clause) of the Master Plastics

Agreement.  (*See NORDAM Proposed Findings & Conclusions* at ¶¶ 93-94.)  As noted, the

Master Plastics Agreement expressly recognized that a Purchase Order might contain additional

terms.  In addition, the General Terms do not "change or terminate" the Master Plastics

Agreement within the meaning of the General Terms' integration clause, and if they did,

paragraph 30 of the General Terms states that the Master Plastics Agreement supersedes any

inconsistent terms and conditions in the Purchase Order.

This last point disposes of NORDAM's contention that any statement in a Purchase

Order that it is a divisible, separate contract is inconsistent with the Master Plastics Agreement

and therefore trumped by paragraph 30 of the General Terms.  (*NORDAM's Proposed Findings
& Conclusions* at 60.)  The argument is based on the erroneous assumption that the Master

Plastics Agreement stated or implied that it and the Purchase Orders were a single, indivisible

agreement.  The Court has reached the opposite conclusion.

### 4.    The Parties' Course of Dealing

The evidence relating to the parties' course of dealing did not controvert the Court's

interpretation.  Hawker had to issue a Purchase Order to trigger NORDAM's obligation to

deliver goods and Hawker's obligation to pay for them.  The parties treated each the Purchase

Order separately.  At any given time, there might be several hundred to a couple thousand

outstanding Purchase Orders.  (Tr. at 139.)  Hawker and NORDAM evaluated each outstanding

Purchase Order on a weekly basis to determine whether it was necessary to expedite, delay, or

cancel it.  (Tr. at 139-40.)  Neither the rescheduling nor the cancellation of a particular Purchase

Order had any effect on any other Purchase Order.  (Tr. at 96, 140.)

NORDAM makes much of the fact that the Purchase Orders were triggered automatically

by computer,[10] contending that this negates any meeting of the minds regarding each Purchase

Order.  (*NORDAM's Proposed Findings & Conclusions* at 39, 58.)  The same could be said of

any option agreement.  Here, the meeting of the minds occurred when the parties entered into the

Master Plastics Agreement.  They agreed on the parts covered by the agreement and the price of

the covered parts.  They agreed that quantities and delivery dates would be set forth in each

Purchase Order.  (Master Plastics Agreement, at § 1.1.)  NORDAM agreed to accept Purchase

Orders for any quantity of goods for so long as RAC manufactured, sold or supported the

particular aircraft.  (*Id.* at § 8.3.)  NORDAM agreed to deliver the goods provided that delivery

date was at least 90 days after the date of the Purchase Order.  (*Id.* at § 5.1.)  Lastly, they agreed

that Hawker was not under an obligation to buy anything from NORDAM unless and until it

issued a Purchase Order.

## CONCLUSION

Each Purchase Order is a separate contract for purposes of Bankruptcy Code § 365.  The

outstanding Purchase Orders are clearly executory (NORDAM must deliver and Hawker must

pay), and can be assumed or rejected on an individual basis.  For the reasons stated, the Master

Plastics Agreement is also an executory contract that the Debtors can assume.  Accordingly, the

---

[10]        Although no evidence was offered on the point, I assume that the order for an aircraft entered in the
Debtors' computer system automatically generated a Purchase Order for the necessary parts.

Court overrules NORDAM's objection to the Plan Supplement, and the foregoing shall

constitute the Court's findings of fact and conclusions of law on the issues addressed in this

opinion.  The parties still have a dispute relating to cure costs, and they are directed to contact

chambers to arrange a conference at which they can discuss further proceedings with the Court.

So ordered.

Dated: New York, New York
       June 13, 2013

                                    /s/  *Stuart M. Bernstein*
                                    STUART M. BERNSTEIN
                                    United States Bankruptcy Judge